UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| KEVIN LEE BERRY, JEREMY JOHNSON, BRIAN G. WILSON, WILLIE PORCHE, and AMBER SMITH, each plaintiff is a citizen of the State of Texas, and each plaintiff individually and on behalf of all others similarly situated, | § § § § § § § | Cause No. 2:19-cv-00023 |
| | § | CLASS ACTION |
| Plaintiffs, | § § § | FIRST AMENDED CLASS ACTION COMPLAINT |
| v. | § § | JURY TRIAL DEMANDED |
| FCA US LLC, F/K/A CHRYSLER GROUP, A DELAWARE CORPORATION, | § § § § | |
| Defendant. | § § § § § § § § | |

Kevin Lee Berry, Jeremy Johnson, Brian G. Wilson, Willie Porche, and Amber Smith,
each individually and on behalf of all others similarly situated ("the Class"), file this suit against
Defendants FCA US LLC, F/K/A Chrysler Group; Fiat Chrysler Automobiles, N.V.; and FCA
North America Holdings, LLC. This lawsuit is based upon the investigation of counsel, the
review of scientific and automotive industry papers, and the investigation of experts with
relevant education and experience. In support thereof, Plaintiffs state as follows:

## I.   INTRODUCTION

1.      Since at least 2013 (and up through 2019), Defendant FCA US LLC, F/K/A
Chrysler Group (hereinafter "FCA") designed, manufactured, distributed, and sold hundreds of
thousands of Jeep Grand Cherokee and Dodge Ram 1500 vehicles with 3.0L EcoDiesel®

engines, all of which contain grossly defective high-pressure fuel injection pump systems. The damning truth about these integral systems, however, remained wholly unknown to American consumers, who unsuspectingly trusted that they would receive what they bargained for.

2.     FCA promotes its EcoDiesel® technology as the best of both worlds: a "green" alternative to gasoline with reduced emissions coupled with diesel's benefits of greater torque, power, longevity, and fuel efficiency. FCA then extracts a premium for these EcoDiesel® vehicles, selling them for thousands of dollars more than the cost of otherwise-comparable gasoline vehicles. The undermining culprit component part in these EcoDiesel® vehicles, however, is the Bosch-supplied CP4 high-pressure fuel injection pump, which, unbeknownst to consumers, is a ticking time bomb when used in American vehicles. As FCA was aware, Bosch's CP4 pump design has *never* been compatible with American diesel fuel standards. The CP4 pump is not built to withstand the specifications for U.S. diesel fuel in terms of lubrication or water content, and it struggles to lift a volume of fuel sufficient to lubricate itself. As a result, the pump is forced to run dry and destroy itself as air bubbles allow metal to rub against metal. The pump deposits metal shavings and debris throughout the fuel injection system and the engine until it suddenly and cataclysmically fails without warning, further contaminating the fuel delivery system with larger pieces of metal. The "catastrophic" (i.e., complete and total) pump failure can occur as early as mile one, as the fuel injection disintegration process begins at the very first fill of the tank and start of the engine, with pump components beginning to deteriorate and dispersing metal shavings throughout the internal engine components and fuel supply system. Further, such catastrophic failure often causes the vehicle to shut-off while in motion and renders it unable to be restarted, because the vehicle's fuel injection system and engine component parts have been completely contaminated with metal shards. The sudden and

unexpected shutoff of the vehicle's engine while it is in motion (and subsequent inability to restart the vehicle) present an inherent and substantial risk to consumer safety—one which FCA itself has recognized in the past—and one which Plaintiffs were not aware of prior to purchasing the Class Vehicles.

3.     What's more, this total fuel injection system failure and consequential engine shutdown results in an outrageously expensive repair, a repair which is seemingly in vain because the repairs will not truly ameliorate the issue so long as the vehicle is being filled with U.S. diesel fuel.

4.     FCA's frequent company line is to blame catastrophic failures on "fuel contamination," something which is not covered under warranty because it is "not caused by" FCA. Consumers are left with repair bills that on average range from $8,000 to $20,000 per vehicle, and may even exceed this amount. Some victims of FCA's grand scam are American businesses who own several vehicles and have suffered multiple failures. Others have spent several hundred or several thousand dollars attempting to remediate and/or mitigate the effects of the condition. Moreover, the Class Vehicles come with a hefty price tag, as these CP4-equipped vehicles can range in price from approximately $42,000 to $67,000 if purchased new and approximately $16,000 to $42,000 if purchased used. Diesel fans pay so much more for their vehicles because diesel engines are traditionally expected to last for a range of 500,000–800,000 miles, given their frequent application to work-related road time.

5.     FCA saw Bosch's CP4 fuel injection pump as another way to make money—to take advantage of consumers' desire to drive diesel vehicles that were ostensibly reliable, durable, fuel-efficient, and powerful. Beyond the reputational "business goodwill" of the

automobile manufacturing brands comprising FCA, the concept of "diesel" itself more broadly conveys reliability, durability, and power.

6.     Well before FCA ever chose to implement the CP4 component part (as incorporated in the diesel engines of the subject Class Vehicles), the issue of U.S. diesel fuel consistency and lubrication was well-known, but nonetheless was totally disregarded in the respective design, manufacture, marketing, and sales or leases of their Class Vehicles. This is further evidenced by the fact that FCA, as well as its fellow domestically-hubbed automotive manufacturers (e.g., Ford and GM), had industry-wide experience with catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s. By 2002, the Truck & Engine Manufacturers Association ("EMA")—of which FCA is a member company[1]—acknowledged that the lower lubricity of American diesel could cause catastrophic failure in high-pressure fuel injection system components that are made to European diesel specifications. Not only did FCA fail to inform American consumers and fail to stop touting the fabricated benefits of the vehicles containing CP4 pumps, they actively attempted to shift the blame to the American consumers. For instance, FCA has claimed it is *consumers'* improper use of contaminated or substandard fuels that damages the vehicles' fuel system, even when FCA knew that the malfunction was *actually* the result of the CP4 fuel injection pump design, which was simply not fit for American diesel fuel.[2]

7.     Just as Class Vehicle engines equipped with the Bosch-supplied CP4 fuel injection pumps are not compatible with American fuel, so, too, FCA's conduct is not compatible with American law. FCA and its affiliates knowingly and intentionally deceived

---

[1]   *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Nov. 20, 2018).

American consumers through its individual representations to respective consumers in a successful-but-unfair effort to increase revenues and profits at the expense of consumers.

8.    Plaintiffs—indeed, *no* reasonable consumer—would have bought these vehicles if FCA's dealings had been materially truthful. These consumers are entitled to be reimbursed for the many millions of dollars FCA fraudulently obtained from them, and to be compensated for their actual losses.

## II.  PARTIES

**A.  The Plaintiffs.**

9.    For ease of reference, the following chart identifies the Representative Plaintiffs and their vehicles:

| Representative Plaintiff | Make | Model | Model Year |
|---|---|---|---|
| Kevin Lee Berry | Jeep | Grand Cherokee | 2014 |
| Jeremy Johnson | Dodge | Ram 1500 | 2018 |
| Brian G. Wilson | Dodge | Ram 1500 | 2015 |
| Willie Porche | Dodge | Ram 1500 | 2016 |
| Amber Smith | Dodge | Ram 1500 | 2015 |

### Plaintiff Kevin Lee Berry

10.    Plaintiff Kevin Lee Berry (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Spring Branch, Texas. On April 26, 2017, Plaintiff purchased a used 2014 Jeep Grand Cherokee EcoDiesel®, VIN 1C4RJFJM3EC373015 (for the purpose of this paragraph, the "Class Vehicle") for approximately $34,733 from Acura of the Rio Grande Valley in McAllen, Texas. Shortly after purchase, in June of 2018, Plaintiff experienced the catastrophic failure of his 2014 Jeep Grand Cherokee's CP4 fuel pump system. The last

---

[2] *See, e.g.*, *infra* ¶¶ 88-89, 91 (discussing instances of FCA blaming consumers for "misfueling"

known current mileage of the vehicle is approximately 55,000 miles. Plaintiff was on the highway coming from church when the vehicle engine light suddenly came on, and immediately thereafter, the Jeep Grand Cherokee died on the highway. Plaintiff had his vehicle towed to FCA US dealership #60399, Boerne Dodge Chrysler Jeep Ram, located in Boerne, Texas, for diagnosis and repair ("Boerne Dodge"). The Boerne Dodge service center work order states, "[c]ustomer states vehicle shut down and would not do anything, would not start, check engine light on." Boerne Dodge Chrysler Jeep dealership diagnosed the issue as being CP4 fuel pump implosion and provided a repair estimate of $9,270.00. To be clear, on the repair invoice, the Boerne Dodge Chrysler Jeep Ram dealership notes, "high pressure fuel pump internal fail" as the problem with Plaintiff's vehicle that needs repair, and includes itemized repair items such as, "FUEL INJECTION PUMP – Remove & Replace," "FUEL INJECTOR – Remove & Replace," "Fuel Injector Washer," and "Fuel Injector/High Pressure Pump Transfer Tube Kit."[3] On July 6, 2018, Boerne dealership provided an invoice quote for $9,270.00 for fuel pump and injectors replacement.

11.    At the time of the catastrophic failure, Plaintiff's Class Vehicle was still under an FCA-backed 5-year/100,000-mile manufacturer's warranty. As Plaintiff conveyed to FCA and Boerne Dodge service center representatives, Plaintiff's only reason for purchasing the Class Vehicle and his previous Jeep Grand Cherokee was for the fact that "if it went down before 100,000 miles[,] the warranty would cover it." Nevertheless, the Boerne Dodge dealership

---

or "fuel contamination").

[3] Despite FCA's assertion that, based on "[a] quick Google search[,] . . . running low on fuel is the #1 cause of fuel pump failure" (ECF No. 19 at 9), this was not the cause of Mr. Berry's vehicle's fuel pump failure, as is evidenced by the repair estimate and the statements made to Mr. Berry by the FCA dealership and FCA regarding his vehicle's diagnosis. Moreover, Mr. Berry's vehicle was not "running low on fuel" at the time of the failure, as it is believed to have had approximately half a tank of U.S. diesel fuel in it when the failure occurred.

service advisors, including Corey Winfield[4] and Jessica Harker, informed Plaintiff that the repair was not going to be covered under warranty, and that this decision was *not* the dealership's decision but was that of FCA US.  In fact, on November 15, 2018, Boerne Dodge service advisor Corey Winfield told Mr. Berry via email that, "We at Boerne Dodge do not have any control over Chrysler warranties.  We do not create them or have any authorization to override them." Plaintiff was instructed by Boerne Dodge service advisors to contact his insurance company or FCA corporate to help with the cost of this repair, in light of the fact that FCA was refusing to cover Plaintiff's catastrophic CP4 fuel pump failure under warranty. In the months that followed his vehicle's catastrophic CP4 fuel pump failure, Plaintiff communicated with the Boerne Dodge dealership multiple times by email and telephone to discuss this repair and warranty coverage, and communicated directly with FCA multiple times via telephone as well.

12.    As instructed by Boerne Dodge, Plaintiff contacted FCA *directly* on multiple occasions to seek warranty coverage for the failed fuel pump costs of $9,270. A representative named Phyllis with FCA was one of the FCA employees who handled the claim. Mr. Berry was informed that his case would be closed and the repair was not covered under warranty. Plaintiff was unable to use his vehicle for at least five months due to the dispute on warranty coverage for failure of the defective fuel pump, and was forced to use another vehicle he owned and significantly depreciate that vehicle's value.  Plaintiff incurred $9,720 worth of repair costs as a

---

[4] Upon information and belief, Corey Winfield is still a service advisor at Boerne Dodge Chrysler Jeep Ram. *See* Boerne Dodge Chrysler Jeep Ram dealership website, section entitled "Meet Our Service Advisors," available at https://www.boernedodge.com/meet-our-service-advisors/
(last accessed on April 20, 2019).  Moreover, according to the Boerne Dodge website, "[t]he technicians at Boerne Dodge Chrysler Jeep Ram are the most highly trained in the San Antonio area.  We have technicians who have completed every, single training program that Chrysler offers. . ." Boerne Dodge Chrysler Jeep Ram dealership website, section entitled "About Us," available at https://www.boernedodge.com/about-us/ (last accessed April 20, 2019).

result of the catastrophic CP4 fuel pump failure. Moreover, Plaintiff lost resale value of the vehicle when he traded it in because of the fuel pump failure and repair, including having to trade the vehicle in for approximately $22,000, which is substantially less than Plaintiff originally paid for the vehicle.

13.    Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. In contemplating his needs, i.e., the need to purchase a vehicle fit for daily use, and occasionally, for pulling a small trailer and/or speedboat, Plaintiff observed FCA's television commercials, radio advertisements, and printed brochures and advertisements wherein FCA claimed the Jeep Grand Cherokee EcoDiesel®—the Class Vehicle Plaintiff would subsequently purchase—had greater fuel economy, superior horsepower, more environmentally friendly emissions, and enhanced durability compared to other comparable vehicles on the American market. FCA's advertisements show the Class Vehicles *driving in America*, thereby representing to consumers and Plaintiff Kevin Berry that the Class Vehicles are compatible with American diesel fuel when they are not. On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied—to his detriment—on the representations by FCA that the Class Vehicle was compatible with American diesel fuel, durable, and reliable. Plaintiff, absent these representations, would not have purchased the vehicle and/or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain, but received less than what was bargained for.

**<u>Plaintiff Jeremy Johnson</u>**

14.    Plaintiff Jeremy Johnson (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Deer Park, Texas. In or around June 2018, Plaintiff purchased a new 2018 Dodge Ram 1500 EcoDiesel®, VIN 1C4RJFJM3EC373015 (for the purpose of this paragraph, the "Class Vehicle") for approximately $52,000 from Southfork Chrysler Dodge Jeep Ram, an authorized FCA dealership in Manvel, Texas. Plaintiff purchased the vehicle for use in driving to-and-from work and for his regular daily activities, and the vehicle currently has approximately 16,400 miles on it.

15.    Prior to purchasing the Class Vehicle, Plaintiff had been looking for a truck that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. In contemplating his needs, i.e., the need to purchase a vehicle fit for daily use, Plaintiff observed FCA's television commercials, radio advertisements, and printed brochures and advertisements wherein FCA claimed the diesel-fueled Jeep Grand Cherokee—the Class Vehicle Plaintiff would subsequently purchase—had greater fuel economy, superior horsepower, enhanced durability, and superior vehicle longevity compared to other comparable vehicles on the American market. Moreover, FCA's advertisements show the Class Vehicles *driving in America*, thereby representing to consumers and Plaintiff Jeremy Johnson that the Class Vehicles are compatible with American diesel fuel when they are not. On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied—to his detriment—on these representations by FCA dealership representatives that the Class Vehicle was, as had been advertised, compatible with American diesel fuel, durable, and reliable. Absent these misrepresentations and omissions by FCA, Plaintiff would not have purchased the vehicle and/or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received

by Plaintiff. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

**Plaintiff Brian G. Wilson**

16.    Plaintiff Brian G. Wilson (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Corpus Christi, Texas. In or around October 2015, Plaintiff purchased a new 2015 Dodge Ram 1500 EcoDiesel®, VIN 1C6RR7LM7FS609112 (for the purpose of this paragraph, the "Class Vehicle") for approximately $49,000.00 from Love Chrysler Dodge Jeep, an authorized FCA dealership in Alice, Texas. Plaintiff purchased the vehicle for his daily use, and also uses it to tow 16-foot and 32-foot trailers hauling hay. The vehicle has approximately 52,000 miles on it, and Plaintiff still owns the vehicle.

17.    Prior to purchasing the Class Vehicle, Plaintiff had been looking for a truck that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. In contemplating his needs, i.e., the need to purchase a vehicle fit for daily use, and occasionally, for towing large trailers, Plaintiff observed FCA's television commercials and other advertisements for the Dodge Ram 1500 EcoDiesel® wherein FCA claimed the Dodge Ram 1500 EcoDiesel®—the Class Vehicle Plaintiff would subsequently purchase—had superior horsepower, greater fuel economy, and enhanced durability compared to other comparable vehicles on the American market. Moreover, these television commercials and advertisements show the Class Vehicles *driving in America*, thereby representing to consumers and Plaintiff Brian G. Wilson that the Class Vehicles are compatible with American diesel fuel, when in fact they are not.  On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied—to his detriment—on the representations by FCA that the Class Vehicle was compatible with American diesel fuel,

durable, and reliable. Absent these misrepresentations and omissions by FCA, Plaintiff would not have purchased the vehicle and/or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiff. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

### Plaintiff Willie Porche

18.    Plaintiff Willie Porche (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Corpus Christi, Texas. In or around October 2016, Plaintiff purchased a new 2016 Dodge Ram 1500 EcoDiesel®, VIN 1C6RR6LM8GS293232 (for the purpose of this paragraph, the "Class Vehicle") for approximately $42,000 from Ron Carter Chrysler Jeep Dodge Ram of League City, an authorized FCA vehicle dealer in League City, Texas. Plaintiff purchased the vehicle for his daily use, and also to tow his 25-foot trailer. The Class Vehicle presently has approximately 34,300 miles on it.

19.    Prior to purchasing the Class Vehicle, Plaintiff had been looking for a truck that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Plaintiff observed and relied upon FCA's television commercials and online advertisements for the Dodge Ram 1500 EcoDiesel® wherein FCA claimed that the Dodge Ram 1500 EcoDiesel®—the Class Vehicle Plaintiff would subsequently purchase—had superior horsepower, greater fuel economy, and enhanced durability compared to other comparable vehicles on the American market. Further, FCA's advertisements show the Class Vehicles *driving in America*, thereby representing to consumers and Plaintiff Willie Porche that the Class Vehicles are compatible with American diesel fuel when they are not.  On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff

reasonably relied—to his detriment—on these representations from FCA, including the representation and understanding that the Class Vehicle was compatible with American diesel fuel. Absent these misrepresentations and omissions by FCA, Plaintiff would not have purchased the vehicle and/or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiff. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

### Plaintiff Amber Smith

20.     Plaintiff Amber Smith (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Forney, Texas. In or around October 2015, Plaintiff purchased a new 2015 Dodge Ram 1500 EcoDiesel®, VIN 1C6RR6LM1FS505418 (for the purpose of this paragraph, the "Class Vehicle") for approximately $47,000 from Rockwall Chrysler Dodge Jeep Ram, an authorized FCA vehicle dealer in Rockwall, Texas. Plaintiff purchased the vehicle because she needed a truck for her daily use, and she was told at the FCA-authorized dealerships that the EcoDiesel® was the way to go. The Class Vehicle presently has approximately 61,000 miles on it.

21.     Prior to purchasing the Class Vehicle, Plaintiff had been looking for a truck that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Plaintiff observed and relied upon FCA's television commercials, online advertisements, and representations from the FCA authorized dealership regarding the Dodge Ram 1500 EcoDiesel® wherein FCA claimed that the Dodge Ram 1500 EcoDiesel®—the Class Vehicle Plaintiff would subsequently purchase—had superior horsepower, greater fuel economy, and enhanced durability compared to other comparable vehicles on the American market. Further, FCA's

advertisements show the Class Vehicles *driving in America*, thereby representing to consumers and Plaintiff Amber Smith that the Class Vehicles are compatible with American diesel fuel, when in fact they are not. On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied—to her detriment— on these representations from FCA, including the representation and understanding that the Class Vehicle was compatible with American diesel fuel. Absent these misrepresentations and omissions by FCA, Plaintiff would not have purchased the vehicle and/or would have paid less for it. In addition, Plaintiff has had to take her vehicle into her FCA-authorized dealership multiple times to fix issues with the Class Vehicle's functionality, which has greatly inconvenienced and frustrated her. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiff. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

### <u>Plaintiffs' Individual and Class-Wide Bases for Suit</u>

22.    Although Plaintiffs were considering other vehicles, Plaintiffs decided on their subject Class Vehicles because they reasonably relied upon FCA's claims touting the Class Vehicles' durability, longevity, efficiency, fuel economy, power and performance, by way of media marketing campaigns and other forms of advertisement described further herein. FCA's advertisements show their vehicles driving in America which implies that their cars are compatible with American diesel fuel. These misrepresentations and omissions, in combination with the representation and understanding that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and (obviously) the representation and understanding that the vehicle was fit for its intended use with American diesel fuel, induced Plaintiffs to purchase the Class Vehicles.

23.     Unbeknownst to named Plaintiffs and other Class members, at their respective times of Class Vehicle acquisition, the FCA-made Class Vehicles contained the defective Bosch-supplied CP4 high-pressure fuel injection pump that was inherently defective and incompatible with U.S. diesel fuel—the material truth of which was never disclosed to American consumers. Consequently, the vehicle was not fit for ordinary use and could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiffs reasonably relied upon. Plaintiffs and each Class member suffered concrete injury as a direct and proximate result of FCA's conduct, and would not have purchased the Class Vehicle and/or would have paid less for it, had FCA not concealed the defective nature of the Class Vehicles. As deemed appropriate, named Plaintiffs' and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the Class Vehicles compared to what they would have paid for non-defective vehicles, out-of-pocket losses suffered by overpaying for the vehicles at the time of purchase (or lease), decreased performance of the vehicles, and diminished value of the vehicles. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain. Plaintiffs thusly bring claims individually and as representatives of the Class.

24.     Each named Plaintiff and/or Class member expected that FCA, via its authorized dealers or through its advertising campaigns, would disclose material facts about the durability, fuel economy, and longevity of its vehicles and the existence of any defect that will result in expensive and non-ordinary repairs.

**B.  The Defendant.**

25.     Defendant FCA US LLC, formerly known as Chrysler Group and renamed FCA US LLC, is a company organized and existing under the laws of Delaware, having a principal

place of business at 1000 Chrysler Dr., Auburn Hills, MI 48326. Defendant FCA US LLC is a business entity registered with the state of Delaware and regularly conducts and transacts business in this jurisdiction and throughout all fifty U.S. states, either itself or through one or more subsidiaries, affiliates, business divisions, or business units. Defendant FCA US LLC can be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas TX, 75201-3136.

26.     FCA, through its various entities, designs, manufactures, markets, distributes, sells, and leases FCA automobiles in this District and multiple other locations in the United States and worldwide under the Jeep, Dodge, Chrysler, and Fiat brand names. FCA, and/or its agents and subsidiaries, designed, manufactured, distributed, offered for sale, sold, and installed the engine systems in the Class Vehicles. FCA also developed and disseminated the materially misrepresentative owners' manuals, warranty booklets, product brochures, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles, with the intent that such documents should be purposely distributed throughout all fifty states. Fiat Chrysler is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

27.     FCA-authorized automobile dealerships act as FCA's agents in selling automobiles under the FCA name and disseminating vehicle information provided by FCA to customers. At all relevant times, FCA's dealerships were its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Defendant's manufacturer's warranty pursuant to the contracts between FCA and its dozens of authorized dealerships in this District and nationwide.

### III. VENUE AND JURISDICTION

28.    Venue is proper in this District under 28 U.S.C. § 1391 in light of the following: (1) FCA conducts substantial business in this District and has intentionally availed itself of the laws and markets of the United States and this District; and (2) Many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia,* FCA's promotion, marketing, distribution, and sale of Class Vehicles containing the defective Bosch CP4 fuel pump in this District. At least one named Plaintiff, as well as thousands of Class members, purchased a Class Vehicle from one of the multiple FCA dealerships located in this District. Further, a significant number of the Class Vehicles were registered in this District and thousands of Class Vehicles were in operation in this District. Venue is also proper under 18 U.S.C. § 1965(a) because the FCA Defendants are subject to personal jurisdiction in this District as alleged, *infra*, and Defendants have multiple agents, e.g., FCA-authorized dealerships located in this District.

29.    The Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs. Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq*. The Court has personal jurisdiction over FCA pursuant to 18 U.S.C. §§ 1965(b) and (d), and Tex. Civ. Prac. & Rem. Code § 17.042, as well as supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

30.    This Court has personal jurisdiction over the FCA Defendants. FCA has committed, and continues to commit, acts giving rise to this action within this State and within this judicial District, and Class Vehicles ended up on this state's roads and in dozens of franchise

dealerships. FCA has established minimum contacts within the forum such that the exercise of jurisdiction over these Defendants would not offend traditional notions of fair play and substantial justice. FCA has intentionally availed itself of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of FCA-brand vehicles in this State and District. FCA derives substantial revenue from its activities and its products being sold, used, imported, and/or offered for sale in Texas and this judicial District.

31.    FCA has more than one hundred authorized FCA-brand dealerships in the state of Texas and sells hundreds of thousands of automobiles each year in this State. FCA provides advertising and customer facing information to these dealers for the purpose of exposing consumers in Texas to that information.

## IV. FACTUAL ALLEGATIONS

### A. The Class Vehicles Contain CP4-Equipped EcoDiesel® Engines.

32.    For purposes of this Complaint, the "Class Vehicles" consist of FCA-manufactured diesel-fueled automobiles equipped with a 3.0L EcoDiesel® engine, ranging from the 2014–present model years of Dodge Ram 1500 pick-up trucks and Jeep Grand Cherokee SUVs. All vehicles falling under this Class Vehicle group were manufactured with the defective CP4 fuel injection pump.

### B. FCA Profits from the Rise of Diesel Vehicles in the United States.

33.    Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power. Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them popular in buses, heavy-duty pick-ups, and vans, including commercial vehicles, farm trucks, and ambulances.

34.     With the invention of common-rail systems, diesel fuel was injected at higher pressure, forming a finer mist that increases fuel efficiency and power. Common-rail systems also made diesel engines burn cleaner and with less noise. While diesel had long been popular overseas, these advances fueled a growing market here in the U.S. for diesel trucks, and even diesel passenger cars.

35.     From the outset, FCA was in competition with fellow "Big Three" auto manufacturers, Ford and GM, each racing to dominate the growing American diesel vehicle market. FCA looked to international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines. The heart of this diesel revolution would be powered by Bosch's reputationally durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit. The CP3 pump was one of Bosch's high-pressure fuel injection pumps. The reliability of the CP3 became key to the "million-mile" performance reputation of diesel truck engines in the U.S. Not surprisingly, American trust in diesel technology grew.

36.     Americans paid a premium for the increased reliability, fuel efficiency, and power of diesel—and, Bosch promised to continue to deliver advances and continued improvements. The CP4 would purportedly maintain reliability while also increasing fuel efficiency and power. The over-simplified design of the CP4 rendered it cheaper to manufacture, but also increased its need for high lubricity fuel, and increased the likelihood that the ultimate failure would be catastrophic.

37.     Much like what occurred in the nationwide Volkswagen emissions scandal involving Bosch, reliance on Bosch's expertise in the design of the CP4 high pressure fuel pump would lead FCA into a course of action it should now regret. The heart of FCA's success under

increasingly competitive fuel efficiencies was Bosch's cheaper, substandard CP4 fuel injection pump. Bosch had the technical know-how to do what needed to be done to get ahead; unfortunately for the American public, the easiest way for FCA to succeed was to cheat American consumers on durability and overall vehicle functionality by equipping the Class Vehicles with this ticking time bomb of a fuel injection pump that dooms the EcoDiesel® diesel engine system from day one.

### C. FCA Knew of the Incompatibility, Defectiveness, and Failures Associated with Bosch's CP4 Pump When Used with American Diesel Fuel Before Deciding to Use It in the Class Vehicles.

38.    The Bosch CP4 pump operates at higher pressures than its predecessor, the CP3, and has inherently higher Hertz contact stresses than the CP3, which exacerbates the wearing of the roller pin, follower and camshaft within the pump itself. In theory, the CP4 achieves greater fuel efficiency by pumping less fuel through the engine. The Bosch CP4 Pump had marginal success in Europe, but it is simply not compatible with American diesel fuel.

39.    The CP4 relies on diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007, the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But more importantly, the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen based polar and organic compounds that give diesel fuel its lubricity. Indeed, ULSD fuel is considered to be very 'dry' and incapable of lubricating vital diesel fuel delivery components, specifically high-pressure fuel pumps and injectors; as a result, American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate

durably, and these fuel injection system components "are at risk of premature and even catastrophic failure when ULSD fuel is introduced to the system."[5]

40.     Low sulfur diesel fuel first appeared in American markets in the 1990s, with fewer than 500 ppm of sulfur. It is estimated that 65 million fuel injection pumps failed as a result. It was thought that the pumps failed at the equivalent of 100–200 hours of operation. Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

41.     Engine manufacturers were well aware of the mismatch between engine part specifications that require a maximum of 460 wear scar, and the lower lubricity specifications of Ultra Low Sulphur American diesel fuel:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions. Diesel fuel injection equipment relies on the lubricating properties of fuel. Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers. This property is not addressed adequately by ASTM D 975.

4/22/2002 Truck & Engine Manufacturers' Association ("EMA"), Position Statement titled, "EMA Consensus Position Pump Grade Specification." FCA is a member of the EMA.[6]

42.     Further, the EMA made clear:

> Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a

---

[5] Arlen Spicer, *Diesel Fuel Lubricity Additives: Study Results*, THE DIESEL PLACE, Aug. 26, 2007, available at http://www.jatonkam35s.com/DeuceTechnicalManuals/Diesel_fuel_additive_test.pdf (last accessed Nov. 29, 2018).

[6] *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Nov. 19, 2018).

> temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that ULSD fuels have a maximum wear scar diameter of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

8/8/2005 Engine Manufacturers Association, Position Paper titled "North American Ultra Low Sulfur Diesel Fuel Properties."

43.     In 2005, the EPA instituted a lubricity requirement for the lower sulfur diesel sold in the U.S. It required sellers of diesel to ensure the fuel meets a minimum lubricity level of a maximum wear scar diameter of 520 microns based on the testing and standard propounded by the American Society for Testing and Materials ("ASTM") D-975.[7]

44.     By 2007, on-road diesel fuel in the U.S. for highway vehicles was uniformly ULSD, which has an allowable sulfur content much lower (15 ppm) than the previous U.S. on-highway standard for low sulfur diesel (500 ppm)."[8]

45.     Moreover, in reality, U.S. diesel frequently contains even less than 15 ppm, a truth that is widely known within the U.S. automotive industry. For example, according to a 2014 Infineum Worldwide Winter Diesel Fuel Quality Survey in which 341 diesel fuel samples

---

[7] *See also* https://www.epa.gov/diesel-fuel-standards/diesel-fuel-standards-and-rulemakings.

[8] *See New Ultra Low Sulfur Diesel fuel and new engines and vehicles with advanced emissions control systems offer significant air quality improvement*, Clean Diesel Fuel Alliance, Feb. 25, 2017,                              available                              at https://web.archive.org/web/20170225141751/http://www.ct.gov/deep/lib/deep/air/ultra_low_sul fur_diesel/ulsdfs.pdf (last accessed Nov. 30, 2018); *see also* J. Thijssen, LLC, *The Impact of Future Diesel Fuel Specifications and Engine Emissions Standards on SOFC*, U.S. DEPT. OF ENERGY, NAT'L ENERGY TECHNOLOGY LABORATORY, Jun. 29, 2004, at I, available at https://www.netl.doe.gov/File%20Library/research/coal/energy%20systems/fuel%20cells/DOE-Diesel-Final-040629.pdf (last accessed Nov. 29, 2018).

were tested from around the world, **all** diesel fuel samples that the organization collected and tested from the U.S. and Canada contained 10 ppm S or less.[9]

46.     A reasonable, prudent manufacturer has a commercially-imposed duty to design or select a fuel injection pump designed for the fuel of the country in which the vehicle is to be sold. Yet, FCA had Bosch supply its inherently incompatible CP4 fuel injection pump for use in its EcoDiesel®-equipped Jeep Grand Cherokees and Dodge Ram 1500s, beginning in the 2014 model year. It was no secret to them that the Bosch CP4 Pump is inappropriate for diesel vehicles in the U.S. The Bosch CP4 Pump specifications for fuel lubricity allow for a maximum of 460 wear scar. By definition, the 520 wear scar specification of American diesel fuel is inadequate to lubricate the Bosch CP4 Pump.

47.     In order to reduce cost and increase fuel efficiency, FCA sold vehicles with a fuel injection pump that was clearly out of specification, having inadequate lubrication for the U.S. market.

48.     The adverse effects of ULSD on high-pressure fuel pump injection systems have been acknowledged within the automotive industry. For example, in a September 2009 Common Position Statement published by the Joint Diesel Fuel Injection Equipment Manufacturers (or "Joint FIE Manufacturers") regarding Fuel Requirements for Diesel Fuel Injection Systems, the Joint FIE Manufacturers expressed the following comments to their colleagues in the automotive industry:

> "The continuous world-wide tendency to increase engine performance and reduce emissions has necessitated the development of new generations of enhanced diesel fuel injection equipment, supporting the achievement of stringent legislation

---

[9] *Infineum Worldwide Winter Diesel Fuel Quality Survey 2014*, INFINEUM INT'L LTD., available at https://www.infineum.com/media/80722/wdfs-2014-full-screen.pdf (last accessed Dec. 3, 2018), at 6-7.

Case 2:19-cv-00023 Document 29 Filed on 04/23/19 in TXSD Page 23 of 93

targets. Rising injection pressures and multiple injections result in higher operating temperatures, increased contract pressures and reduced clearances . . . . Alterations to fuel quality, e.g., by increasingly severe refinery hydroprocessing being introduced to remove Sulphur also reduce the content of aromatics and destroy surface active compounds and antioxidants. ***Removal of these beneficial compounds effects boundary lubrication, commonly known as lubricity, and inherent oxidation stability and must be compensated for.*** Fuel parameters such as cetane number, viscosity, density, lubricity, oxidation stability, sulfur and aroma content, together with the absence of free water and dirt contamination, are key parameters required to ensure performance of equipment in the field.

"Biofuels are becoming increasingly available to end-users [including] in the United States of America . . . . It must be recognized that the physical and chemical characteristics of bio components are significantly different to conventional fuels and that care must be taken in their specification and use.
"Diesel fuel injection equipment (FIE) manufacturers fully support the development of alternative sources of fuel . . . . ***However, many vehicles, engines and equipment are not designed to run on them. It is recommended to refer to the vehicle and engine manufacturers 'Limitations of Use' documents for guidance.***"[10]

49. Likewise, in a July 2014 study on the use of fuel injection equipment with global diesel fuels, Parker Racor, the leading global supplier of diesel fuel filtration systems, explained the following:

"The increase in system pressures in diesel engines has a significant effect on filtration requirements. These systems are highly vulnerable to many forms of contaminants and the need for robust high efficiency filtration has never been higher. . . . An analysis of global diesel fuel quality shows that although the fuel quality in the developed markets has improved, significant quality concerns still remain. Levels of water and contaminants remain at levels that can cause long term issues to the latest fuel injection systems. Specifically, the levels of contaminants smaller than 5 microns remain very high. These particles can be small enough to

---

[10] Joint FIE Manufacturers, *Fuel Requirements for Diesel Fuel Injection Systems: Diesel Fuel Injection Equipment Manufacturers: Common Position Statement 2009*, Sept. 2009, available at http://www.globaldenso.com/en/topics/files/common_position_paper.pdf (last visited Nov. 29, 2018) (emphasis added).

- 22 -

pass into the internal clearances of high pressure fuel injection systems and can lead to erosion and wear of critical areas leading to a loss in system performance and eventually system malfunction. Diesel filtration balances pressure drop, useful life and efficiency. ***However the real long term effect on fuel system life is often not adequately considered[,] as much of the engine durability testing performed is done using high quality fuel that doesn't represent the range of fuels seen in the market***. Consideration of filtration performance under less than ideal conditions is necessary to develop an acceptable level of protection."

Steven Hardison & Adam Pearce, *July 2014 Summary of Fuel Injection Equipment with Respect to Diesel Fuel Filtration*, PARKER RACOR & AVL, Jan. 7, 2015, available at https://www.parker.com/literature/Racor/RSL0194%20Rev%20-%20(TAP_AVL-Fuel-Study-Racor).pdf (last accessed Dec. 3, 2018), at i; *see also id.* at 13 ("Careful monitoring of fuel quality and filter performance is needed to protect sensitive diesel engine injection systems"); *id.* at 29 ("To avoid costly engine and fuel system components damages, advanced multi-stage filtration is recommended"); *id.* at 31 ("Modern high pressure diesel fuel injection systems contain very small internal clearances and are vulnerable to any build-up of deposits on these components. . . . This issue has become a significant concern in the industry").

50.    Indeed, the automotive industry knew of the consequences of this early-on. For example, in May 2010, after analyzing foreign particles found in the fuel filter of a failed Audi diesel engine and determining that the biodiesel used in the subject engine was "insufficient[ly] cleans[ed]" resulting in deposit formation "which is not conducive to establishing the lubricating film in the [fuel pump] roller support," Bosch noted that, "When [diesel fuel] viscosity is too

low, the lubricating film is not established properly and mixed friction and surface contact occurs = bad."[11] The CP4 is, by its own specifications, expected to fail quickly when used in the U.S.

51.    The Bosch CP4 Pump multiplies the diesel fuel problem in ways that are catastrophic. FCA chose the Bosch CP4 Pump because it was cheaper to manufacture and was supposed to improve fuel efficiency by using less fuel. The Bosch CP4 Pump struggles to adequately lubricate itself with a lower volume of fuel and at the speed and high pressure at which it operates.

52.    The combination of the low volume of fuel, which is under constant suction, and the low lubricity of the fuel, allows cavitation of the fuel. Air pockets form inside the pump during operation. These air bubbles allow metal to rub against metal. FCA had achieved greater fuel efficiency at the expense of running the pump dry.

53.    As the Bosch CP4 Pump wears, it sends metal shavings and sometimes even larger particles throughout the fuel system. As the shavings disperse and contaminate the engine and the high-pressure fuel system, the fuse of the proverbial CP4 "time bomb" has been lit, and it is only a matter of time before the entire engine system fails. The failure of a CP4 pump requires repair or replacement of the entire high-pressure fuel system, including the pump, fuel injectors, fuel rails, and injection lines. Repair costs when a CP4 pump fails often average between $8,000 and $20,000 per failure.

54.    As Diesel Tech Magazine, an industry publication, aptly explained in its December 2017 article entitled, "Common Problems: The CP4 Time Bomb[:]"

> "It's always frustrating to finally get your hands on a brand-new truck (or at least, new to you) and find out there's something

---

[11] Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 12-14 (May 26, 2010 email chain between Audi and Bosch representatives re: "Particle analyses, fuel filter").

wrong with it. It's even more frustrating to learn that not only are you not alone in your suffering, but that it's a common problem to your vehicle . . . . To kick things off, we're going to look at something that's very near and dear to our hearts: the CP4 injection pump . . . . Boy, where to begin? People have taken a somewhat hyperbolic approach and refer to the CP4 as a time bomb, among other colorful terms. The thing is, they're not too far from the truth. Even if you have a 100 percent stock pickup, there's a *really* good chance that you're going to be on the receiving end of a $10,000 bill when it finally goes out on you and destroys your entire fuel system."[12]

55.    The Bosch CP4 fuel injection pump was defective and incompatible with U.S. diesel fuel from the get-go, even prior to its usage in the Class Vehicles. CP4-based failures began running rampant in American Audi and Volkswagen vehicles at least as early as 2008.[13] These failures echo the very failures that continue to occur in the Class Vehicles to this day, and from late 2011 through early 2012, documentation regarding these widespread CP4 failures was publicly provided by Bosch, Audi, and Volkswagen to the National Highway Traffic Safety Administration ("NHTSA") in connection with NHTSA's Office of Defect Investigations ("ODI") Inquiry No. INRD-EA11003, an investigation which FCA was involved in as well.[14]

---

[12] Trevor Mason, *Common Problems: The CP4 Time Bomb*, DIESEL TECH, Dec. 2017, available at https://www.dieseltechmag.com/2017/12/common-problems-the-cp4-time (last accessed Nov. 28, 2018) (internal punctuation omitted).

[13] *See, e.g.*, Jul. 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit speechless" about "[t]he shavings, or whatever it is"), submitted as part of Bosch's May 2012 responses to NHTSA ODI Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 6; *id.* at 27 (Jul. 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [**REDACTED**] (higher by a factor of approx. 30 than the average of all markets) . . . . Have you any information suggesting that such a thing could be possible with this country-specific diesel fuel?"); *id.* at 28-31 (Feb.-May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in which the parties discuss the substantial increase in warranty claims with the implementation of the CP4 in vehicles in the U.S. market).

[14] *See, e.g., infra* ¶ 62 and corresponding footnotes (discussing FCA's responses to NHTSA's requests pursuant to ODI Inquiry No. INRD-EA11003).

56.    This documentation demonstrates the nature of the CP4 defect that would ultimately come to exist in the Class Vehicles. For example, in August 2009, Audi sent Bosch a failed CP4 fuel pump for analysis after "[t]he high pressure fuel pump failed catastrophically shedding metal shavings throughout the entire fuel system . . . . This car will require a complete new fuel system from tank to injectors and everything in between. This will be a very lengthy repair (weeks) . . . . We need to determine if component failure or bad fuel is to blame." March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 35. Thereafter, on September 1, 2009, Bosch responded to Audi with the following flippant analysis note from their failed pump inspection: "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. **Defect caused by customer**." *Id.* at 38 (emphasis added).[15]

---

[15] *See also* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 21 (Mar. 31, 2008 email from Volkswagen to Bosch re: "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and the Volkswagen representative frustratedly states, "Can you (panel of experts) explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . . We also see a big risk here for our BIN5 pump, which has to manage with the same fuel in USA"); May 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 9-10 (Jul. 4, 2008 email from Audi to Bosch re: "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail? Because of a different fuel?"); *id.* at 13-14 (Jul. 11, 2008 email between Audi and Bosch representatives re: "W19 BIN5 pump failure" in which Audi writes, "For the zero error meeting in FeP on Tuesday we expect the information discussed at the error meeting on endurance testing of fuels with 'poor lubricity, containing water etc.' and all failures, drivetrain damage in all component, system and other endurance runs of Bosch and all customers"); Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 7 (emphasis added) (Jun. 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll see that **we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is**"); *id.* ("I'd prefer to have a more robust pump").

57.    Thus, even early on, it was well known in the U.S. automotive industry that there were serious U.S. diesel incompatibility issues that now run rampant in the Class Vehicles due to the defective CP4 pump.

58.    Likewise, in September 2009, Bosch, at the time supplying the defective CP4 fuel pump to Audi and Volkswagen, received a notice from Audi about a "3rd HPP failure" in the U.S., explaining, "I'm afraid there's bad news from the U.S.: After 2 failures in the field . . . the 3rd HPP failure has now occurred in the EC endurance run."[16] Photos attached to the email show the failed Bosch CP4 fuel pump, replete with metal shavings in the gasket:[17]



---

[16] Sept. 2, 2009, email from Audi representative to Bosch representatives regarding "3rd HPP Failure USA," produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Nov. 6, 2018), at 146.
[17] *Id.* at 148–50.







59.    In June 2011, Bosch received a report from Volkswagen regarding a CP4 pump failure in a 2.0L Volkswagen TDI in which the Volkswagen representative explained, "I have here a pump from [sic] a 2.0L TDI. I have been testing a lot of these this week and many have an amount of 'metal Debris' or other metallic particles in them."[18]

60.    Indeed, Bosch CP4 failures in U.S. Audi and Volkswagen vehicles were widespread and catastrophic by the end of 2011. *See, e.g.*, Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 69 (Sept. 15, 2011 email from Volkswagen to Bosch re: "080211_Status_CP4.1_Bosch," in which the Volkswagen representative notes, "*I think the [CP4] failures are well known*. It is also important to know that not only the high-pressure fuel

---

[18] Mar. 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 12 (Jun. 9, 2011 email from Volkswagen Group of America, Inc. to Bosch re: "2.0L TDI Fuel Pump").

pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost >[**REDACTED**] caused by chip contamination") (emphasis added).[19]

61.    Notably, on December 10, 2011, FCA submitted to NHTSA responses regarding Inquiry No. INRD-EA11003, in which NHTSA requested FCA provide information and documents regarding "peer vehicles" of Volkswagen and Audi diesel vehicles using high-pressure fuel pumps and potential U.S. fuel compatibility issues, to which FCA responded that "Chrysler does conduct vehicle level durability/reliability testing with fuels representing the specific markets that it is sold in."); *id*. at 22–23. Further, in response to NHTSA's inquiry requesting that FCA produce copies of all recommendations and warnings regarding diesel fuel quality that FCA had in its possession, FCA stated:

> Chrysler has in its possession diesel fuel surveys from the American Automobile Manufactures' Association ("AAMA"), International Fuel Surveys which contain fuel survey data for the United States. Chrysler also has diesel fuel survey data provided to Chrysler by Infineum.[20]

62.    Yet FCA went on to commission Bosch's CP4 fuel pump for use in its 2014–18 EcoDiesel® engines, having been enticed by the prospect of a cheaper fuel injection pump than the CP4's predecessor, the better-reputed CP3.

---

[19] *See also* Mar. 22, 2011, email from Bosch employee to Volkswagen employees regarding analysis of failing CP4 fuel pumps, produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Nov. 6, 2018), at 11 (showing that, by March 2011, Bosch was continuing to receive "a respectable number" of CP4 "mechanical breakdowns" in the U.S.); *id.* at 19-22 (spreadsheet showing results of Bosch's pre-analysis of HPFP failures in Volkswagen/Audi vehicles where "metal chips found in fuel system").

[20] *See id*. at 20. (listing the following resources: (1) Worldwide Winter Diesel Fuel Quality Survey 2004; (2) Diesel Fuel Quality Trends 2005; (3) North American Diesel Fuel Trends 2007; (4) Worldwide Winter Diesel Fuel Quality Survey 2008; North American Diesel Fuel Trends 2009; and (5) Worldwide Winter Diesel Fuel Quality Survey 2010.)

### D.  Model Year 2014: FCA Equips its EcoDiesel® Engines with the Incompatible Bosch CP4 Pump.

63.    As part of a strategy to expand its North American presence, in 2009, Fiat began its acquisition of one of the "Big Three" U.S. automakers, Chrysler. In November of that year, then-FCA CEO Sergio Marchionne unveiled an ambitious 5-year plan to, among other things, roll out "more diesel variants" under the Jeep brand and to give Ram's "Light duty (1500)" pickup truck a "refresh/facelift."[21]

64.    By July 2010, FCA began investigating strategies to develop and market diesel vehicles in the North American market. As early as February 2012, Chrysler had already commissioned and presented research to understand how to market the diesel vehicles to consumers.

65.    In approximately 2011, VM Motori announced a new diesel engine: a V6, 3.0-liter displacement engine intended for inclusion in SUVs, trucks, and large sedans. This engine had been under development for use in a General Motors automobile for the European market.[22] However, Fiat acquired 50% of VM Italy in 2011, and began working with VM Motori to develop the engine for use in FCA vehicles to be sold in the United States.

66.    By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA, and VM Motori, a long-time engine supplier, was now part of the Fiat Chrysler sprawling family of affiliated companies. In May of that year, FCA announced another five-year plan at the Auburn Hills, Michigan headquarters to increase Fiat Chrysler's competitiveness against global auto giants, such as Toyota, Volkswagen, and General Motors, by increasing annual sales to 7

---

[21] Todd Lassa, *Fiatapolooza! Chrysler's Five-Year Plan, MotorTrend* (Nov. 6, 2009), http://www.motortrend.com/news/chrysler-five-year-plan/.
[22] Chad Westfall, *An Inside Look At The Ram 1500 3.0L EcoDiesel, Engine Labs* (Jan. 11, 2015), http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/.

million vehicles by 2018, up from 4.4 million in 2013.[23] Integral to the strategy was the expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram 1500," including "diesel engines."[24]

67.    In the years preceding the now-infamous (and worldwide) diesel emissions scandals, Mr. Marchionne, as the CEO of FCA N.V. and FCA US, is alleged to have been a champion of leveraging FCA N.V.'s strength in diesel engines to promote the sale of light-duty diesel engine vehicles in the United States. *See In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Products Liab. Litig.,* 295 F.Supp.3d 927, 976 (E.D. Mich. 2018) (citing plaintiffs' first amended complaint). "He made the sale of light-duty diesel-engine vehicles in the United States a part of his 2009 and 2014 five-year plans to increase the FCA Defendants' sales and market share." *Id.* (citing same). "He also made numerous public statements on behalf of Fiat Chrysler concerning the Class Vehicles, their EcoDiesel® engines, and their emissions and performance characteristics." *Id.* (internal quotations and citations omitted). "With respect to emissions, he specifically noted in 2012 that he was still 'optimistic about the potential of light-duty diesels in the U.S. despite significant emissions challenges.'" *Id.* (quoting former FCA CEO Sergio Marchionne).

68.    When FCA's EcoDiesel® first hit the U.S. market for the 2014 model year, FCA Chief Engineer for RAM Truck Brands, Mike Cairns, proclaimed the following:

> "We know there is a lot of interest [for diesels]. For years we have had customers asking, why not a light duty diesel? There is a lot of interest. People know they will get great fuel economy, great

---

[23] Jerry Hirsch and David Undercoffler, *Fiat Chrysler Unveils Aggressive Five-Year Plan, Los Angeles Times* (May 6, 2014), http://www.latimes.com/business/la-fi-chrysler-revamp-20140507-story.html.

[24] Christian Seabaugh, *Ram and Ferrari's Place in Fiat Chrysler's Five-Year Plan*, MotorTrend (May 6, 2014), http://www.motortrend.com/news/ram-and-ferraris-place-in-fiat-chryslers-five-year-plan/.

durability, and reliability with a diesel. It has always been a difficult business case because diesels are expensive, and there is a lot to developing a diesel engine . . . .

"We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. As well as working with our Jeep brethren on the diesel for the Grand Cherokee. We combined resources and developed them together. That cut the engineering cost down, and made us able to bring this to market. So, it really isn't a big risk . . . .

"Unlike diesels of the past that were really heavy, this [CGI] is very efficient, but gets the structural requirements you need for a diesel. So, it [the complete engine] actually weighs a little more than a Hemi engine but provides great diesel performance and fuel economy."[25]

69.    FCA also touted the EcoDiesel®'s "optimized" Bosch CP4 fuel injection pump, with market-wide representations about the pump's ability "to maintain 2,000 bar (roughly 29,000 psi) in both fuel rails," and about how FCA engineers "optimized the firing order to manage the inertia and firing loads eliminating any need for a balance shaft, common to many V6 engines."[26]

70.    The EcoDiesel® engine originally was developed for use in Europe, where diesel fuel standards allowed for higher lubricity and more favorable viscosity than those in the U.S. Rather than make the engine compatible with U.S. diesel fuel standards, FCA opted to circumvent its commercial obligations of fairness and honesty to American consumers, effectively implementing an incompatible component fuel pump system, which—to this day—falls short of U.S.-based performance specifications. In reality, FCA sought to unfairly grab a piece of the U.S. diesel market beyond its existing heavy-duty diesel trucks and, in late 2013, it

---

[25] Chad Westfall, *An Inside Look at the Ram 1500 3.0L EcoDiesel*, DIESELARMY, Jan. 11, 2015, available at https://www.enginelabs.com/engine-tech/engine/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/ (last accessed Nov. 29, 2018).
[26] *Id.*

introduced both the light-duty 2014 Ram 1500 "EcoDiesel®" and 2014 Jeep Grand Cherokee "EcoDiesel®" Class Vehicles. Subsequent model years have continued to come mal-equipped with the CP4 fuel pump systems.

71.    Indeed, FCA doubled-down on its wager to escape accountability for its conscious decision to use the non-compliant CP4 pump as the "beating heart" of its EcoDiesel® engine systems. Rather than admit faulty design, and responsibly pay to redesign and replace and its defective fuel pump systems, FCA has educated dealerships on how to deceive customers by convincing them that the devastating failures were caused instead by anything from cold weather to hot weather to contaminated fuel.

**E.  The CP4 Defect Poses an Inherent Risk to Vehicle Occupant Safety and Renders the Class Vehicles *Per Se* Defective.**

72.    The federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

73.    The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. *See United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five (5) days of learning about a safety defect, a

manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)–(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

74.     FCA has violated the Safety Act, and moreover violated basic design guidelines in designing, manufacturing, and distributing vehicles which are not compatible with American diesel fuel and which can cause a moving stall, thereby presenting an inherent risk to occupant safety that FCA itself has recognized in the past.[27]

75.     To be sure, FCA has seen **scores** of consumer complaints regarding the now-notorious CP4 pump failure. FCA, like other automotive manufacturers, not only receives and tracks driver complaints directly from its customers, but also monitors the NHTSA website and other websites to evaluate potential problems affecting its vehicles.

76.     For example, on August 20, 2014, the owner of a three-month-old 2014 Jeep Grand Cherokee EcoDiesel® posted the following in the "Jeep Grand Cherokee Diesel Forum" of DieselJeeps.com under the heading, "3 Months Old—Fuel Pump Implosion:"

---

[27] *See, e.g.*, Jan. 11, 2018, NHTSA FCA Part 573 Safety Recall Acknowledgment Letter regarding NHTSA Recall No. 18V-049, available at https://static.nhtsa.gov/odi/rcl/2018/RCAK-18V049-8191.pdf (last accessed Nov. 24, 2018) (FCA acknowledging that the risk of moving stalls in the 2017 Chrysler Pacifica "increase[s] the risk of a crash").

"[L]oved my limited GC ED [Grand Cherokee EcoDiesel®] for the first 3 months, no issues, great mileage. On way home from first [o]il change at dealer, car violently started shaking, then shut down after 'low oil pressure' light flashed on (over the span of 3-5 seconds as I tried to pull over). We are now in the 4th week of this car being in the show still... ***Dealer has showed me pictures and a sample of the metal shavings that were released when the high pressure fuel pump failed,*** very strange... I wonder what Jeep will do to make this right?"[28]

77.    Two days later, another user responded:

"This is a known issue. The Bosch CP4.0 HPFP on the GC [Grand Cherokee] is very sensitive to fuel impurities. It is self-lubricating by the diesel and if the fuel does not have enough lubricity or is contaminated with water or gasoline the pump will cease and send metal shavings throughout the entire fuel system. This happened to many VW Jetta's that use the same new pump. The previous Bosch CP3.2 was much more resilient in that aspect. The repair will be very expensive so Chrysler will probably request a test of your fuel. If possible, get a fuel sample and test it yourself. Make sure you have your latest refueling receipts available. Many new CRD owners (me included) use lubricity additives to make sure the diesel will properly lubricate the engine as US diesel lubricity quality is questionable."[29]

78.    Likewise, on October 28, 2014, the owner of a 2014 Dodge Ram EcoDiesel® posted the following on DieselRamForum.com which, as discussed below,[30] further demonstrates how there is no true fix to the problem:

"I picked up my brand new ED [EcoDiesel®] on 9/17/14 after about 4 months of research into this new flavor of ram . . . .

---

[28] Aug. 20, 2014, DieselJeeps.com forum post re: "3 Months Old—Fuel Pump Implosion," available at https://www.dieseljeeps.com/threads/3-months-old-fuel-pump-implosion.830/ (last accessed Nov. 28, 2018) (emphasis added) (ellipses in original)s.

[29] Aug. 22, 2014, DieselJeeps.com forum post re: "3 Months Old—Fuel Pump Implosion," available at https://www.dieseljeeps.com/threads/3-months-old-fuel-pump-implosion.830/ (last accessed Nov. 28, 2018).

[30] *See infra* ¶¶ 102-09 (discussing supposed "remedies" which are inadequate because the CP4 pump will continue to be incompatible with U.S. diesel).

"1700 miles and three weeks into my new ownership, I parked the truck in a parking lot, and when I got in about 10 minutes later the truck wouldn't start. The starter would engage, but no fire. Tried several times, and finally had it towed in.

"Dealer had it for over a week scratching their head before star told them to replace the injector pump. After that, the truck still would not                                                        start.

"Star told them to get some sort of diagnostic tool to tell them which injector was bleeding off pressure, but nobody actually seems to have this tool except the training centers. I started feeling like I was about to be trapped in a 6.0 powerstroke scenario already.

"Mechanic has been fantastic throughout this whole mess, and finally got tired of waiting for star. *So he pulled an injector and guess what? Metal.* He showed me where he had cleaned it out on a white napkin and the metal is like a very fine sand consistency. *So he did a little digging and found out that apparently they had a                 bad                 run                 of injector pumps.*

"So now, he is telling me that they are ordering new everything forward of the injector pump and *hoping* that replacing those components will fix the problem.

"My main concern is this: What are the chances that this metal could have caused damage inside the cylinders? The dealership seems resistant to my request to have the cylinders inspected (In fact, their answer was 'If it starts and runs ok, then we are done['']). I am not so comfortable just accepting this answer and driving off . . . . So far, the dealership has had my truck two days less than I actually had it on the road."[31]

79.    In December 2015, the owner of a 2014 Dodge Ram 1500 EcoDiesel® opened a thread entitled, *"Anyone have to have their fuel system completely rebuilt on their EcoDiesel?"* on the Ram1500Diesel.com online forum, in which he explained the following:

---

[31]   Oct. 28, 2014, DieselRamForum.com post re: "Major Fuel Problem," available at https://www.dieselramforum.com/forum/2014-ram-1500-ecodiesel-troubleshooting/6330-major-fuel-problem.html (last accessed Nov. 28, 2018).

"As the post title says, has anyone had to have their fuel system rebuilt?

[. . .]

This is just the latest problem in a laundry list of issues I've had with my truck. I'll give a basic run down of the latest problem.

About 2-3 weeks to this error I started getting the dreaded Electronic Throttle Control Error . . . . The first and second time I got this error I was able to clear it. The third time I was able to clear the code but it malfunctioned (truck was essentially limited to about 40 or 45 mph) so I had the truck towed. The shop was unable to duplicate the issue or find any error reports since I cleared the code.

About a week or so later, my check engine light came on so I took the truck to the shop. My truck had 2 faulty sensors that needed repaired (probably why I lost 3-4 mpg's). One needed ordered so I had to wait two days to get my truck back. After I picked my truck, not even 2 miles down the road, I got the Electronic Throttle Control Error. I went back to the garage (and luckily made it right before closing) and they ran the truck through their computers and got the same error code I was getting before. I waited about an hour for Enterprise to get there with a rental truck . . . .

This happened Friday afternoon. I was originally told everything should be done by the following Friday (12/11). On Monday, I found out that this was going to a much more involved repair than they originally thought. My entire fuel system has to be rebuilt because it got contaminated while the truck was being manufactured. Parts are backordered so I have no idea when I'll actually get the truck back.

This makes me ask, if this got contaminated, what else got contaminated? Quite frankly, I'm scared to see my repair bills after this truck falls out warranty. I closed on the truck the day before Thanksgiving 2014. It has 20k miles on it and I'd estimate its been in the shop for 1-2 months (after this repair) with all my issues. I'm speaking to an attorney tomorrow about my options as I have no faith in the reliability of my EcoDiesel. . . ."[32]

---

[32] RAM1500DIESEL.COM, forum thread entitled, "Anyone have to have their fuel system completely rebuilt on their EcoDiesel?," Dec. 21, 2015, available at https://www.ram1500diesel.com/forum/ram-1500-diesel-mechanical/9347-anyone-have-have-their-fuel-system-completely-rebuilt-their-ecodiesel.html (last accessed Dec. 3, 2018).

80.    Less than ten minutes later, another forum user responded, "Talked to my diesel tech at the dealership this morning. He's done one & said it was a REAL PITA ['pain in the ass'] . . . metal shavings everywhere. Believe an injector went. I'll quiz him a little more when I pick up my truck this evening."[33]

81.    Shortly thereafter, a third user responded:

> "Google Bosch CP4.2 HPFP problems. May be the source of your contamination. My 2015 has been in the shop for two weeks with metal shavings in the fuel. Bigger problem may be that those shavings end up in the entire fuel system all the way back to the tank. This may require replacing all fuel system components[.]"[34]

82.    Notably, after the original thread-initiator stated that his dealership represented that the problem was due to supplier factory contamination, another user aptly responded that, "***It[']s absolutely impossible to have factory contamination and run 20K miles. When HPCR [High Pressure Common Rail] systems see any type of contaminates they last seconds before failure or performance problems***."[35]

83.    Our original thread poster naively . . . responds, "That[']s what seems odd to me, *but that[']s what the RAM dealer told me was the issue. [They] confirmed it with corporate . . . . Tomorrow makes day 18 in the shop*."[36]

84.    Two weeks later, *another* owner of a 2014 EcoDiesel® wrote, "My 2014 ED [EcoDiesel®], 31,000 mi[,] is in the shop now . . . . Determined that fuel pump had [a]

---

[33] *Id.*
[34] *Id.*
[35] *Id.* (emphasis added).
[36] *Id.* (emphasis added).

catastrophic failure and aluminum shards throughout fuel system . . . . I am a bit concerned about the metal reaching the engine . . . ."[37]

85.     Similarly, on February 26, 2016, the owner of a 2015 Dodge Ram submitted the following complaint to NHTSA regarding the defective condition:

> "THE VM MOTOR HAS NUMEROUS FAILURES RESULTING FROM THE CAMSHAFT GEAR ON THE FUEL PUMP SIDE OF THE MOTOR SLIPPING AND CAUSING CATASTROPHIC ENGINE FAILURE. THESE PROBLEMS WILL OCCUR GENERALLY AFTER 70K MILES . . . . ECODIESEL OWNERS PAID A PREMIUM FOR THE DIESEL UPGRADE SINCE DIESEL MOTORS ARE RENOWN FOR THEIR LONGEVITY. THIS ACHILLES HEAL MARRING THE RELIABILITY AND CAUSING AN UNSAFE TIME BOMB SHOULD HAVE BEEN ADDRESSED BY THE MANUFACTURER TO RECALL THE VEHICLES. THUS FAR RAM HAS NOT TAKEN ACTION . . . ."[38]

86.     On April 7, 2016, the owner of a 2014 Dodge Ram Lonestar Crewcab with only 21,000 miles relayed the following CP4-pump-implosion experience on the Ram1500Diesel.com forum:

> "Earlier this week, with just over 21000 miles on the truck, the engine began to sputter, the check engine light came on, 'Electronic Throttle Control' message appeared, then the engine shut down completely. Fortunately, this happened only a mile from the house. After a tow to the dealer, and a couple of days for diagnostics, the dealer concluded the high pressure fuel pump failed. They replaced the pump, and the truck failed to start. At this point, they performed an autopsy on the old pump and discovered it was full of metal shavings. The dealer then contacted Chrysler. Chrysler recommended a 'complete fuel system replacement.' The dealer explained a 'complete fuel system replacement' means dropping, draining and cleaning the tank, replacing the in-tank pump, fuel filter housing, fuel filter, various lines, injectors, etc..., and 'flushing the entire system.' Not really confident in the dealer's approach as they said the high pressure pump that was replaced in

---

[37] *Id.*
[38] NHTSA ID No. 10838539.

beginning would be fine. Seems to me that if metal shavings are contaminating the entire fuels system, the new HPFP would now be contaminated as well."[39]

87.    As one of many instances of FCA blaming the consumer for the failure of its

defective vehicles, the following was posted on CarComplaints.com by the owner of a 2016

Dodge Ram EcoDiesel®:

> "On August 26, 2016, a beautiful sunny day, I was driving to work and my new truck started to buck and sputter. It was fairly obvious at the time that there was a fuel delivery problem. I limped the truck to the local dealer in the city where I work and explained the problem to the service desk. I was told later that day that there was a misfire in Cylinder #3 and that the injector was 'bad'. The dealer replaced the injector (more on that later). [Two days later,] I needed to hook the truck up to my trailer in preparation for our trip. I turned the engine over—the truck bucked like a horse (a very obvious misfire). The truck continued to idle, quite roughly, but would not budge. I learned later that the truck was now in safe mode—which means it will not move. Disappointed, slightly angry, and somewhat confused as to what was happening to my new truck—I called roadside assistance to tow the truck to dealer [from] whom it was purchased. . . .  Incidentally, FCA does not supply rental vehicles for warranty repairs unless you have purchased and extended warranty package—which I did not . . . . So what has happened over the last 5 weeks? Again—thanks for asking! Almost nothing. The first fix suggested by FCA was to replace a check valve in the fuel line between the low pressure and high pressure pump . . . . After replacing the check valve the dealer took the truck for a road test. I am not sure if he or she actually made it off of the lot—but suffice it to say the truck failed that test . . . . Fast forward 1 week while FCA mulled over the issue (I have an image in my head of a cow chewing cud). Alas, they could not seem to come up with a solution—*So they took the next logical step and blamed me*. I received a call from the dealers' service desk, and with some sorrow, and sympathy, like he was telling me that my dog had just died—***I was told that FCA believes that 'You are running bad diesel'***. REALLY!! . . . . My tractor is diesel—and I run this same fuel without issue. I live in a rural area, where there are plenty of diesel trucks filling up at this station all of the

---

[39] Dec. 6, 2017, Ram1500Diesel.com forum post re: "High Pressure Fuel Pump Implosion," available at https://www.ram1500diesel.com/forum/ram-1-500-diesel-mechanical/11039-high-pressure-fuel-pump-implosion.html (last accessed Nov. 7, 2018).

time (it is an independent station) and do not seem to be having issues . . . . So daily calls to the dealer to discuss my dilemma with the chap at the service desk . . . . More nothing, and more nothing. I am becoming quite concerned. On the advice of the chap at the service desk I open a file with FCA Canada Customer care. This way they can track my issues and compare it with other issues that are happening around North America to try to solve my very perplexing problem. Thursday September 15—I have been communicating with FCA daily—please let me clarify communicate—I call you 5 times, you push me to voicemail every time and almost never call me back. And when you do call me back—you tell me you are waiting for information from the dealer, and that the good folks at tech-line have been enlisted to solve my mystifying problem. That is funny—because I called the dealer this morning and they were waiting on you. Has there been a breakdown in communication? I drive to the dealer to pop in on them just to check. I am ushered out to the service bay where I get to talk to the diesel specialist. 'Now we are getting somewhere' I say to myself. The diesel specialist then shows me six things. 1. The high pressure regulator—***This is obviously completely clogged with shards of metal. Little tiny bits of shiny, silver metal. It is obviously beyond repair. 'Well there is the problem' I say. The specialist agrees***. 2. The fuel filter. I expected, being a diesel filter that it would be black. It did have a tinge of grey however looked remarkably clean. 'Nothing wrong with that filter' I say to the diesel specialist. He agrees. 'Looking good.' 3. The high pressure fuel pump . . . . A bad one looks the same as a good one, but I have already deduced that this is the most obvious source of the little bits of metal that are clogging the regulator . . . . . 6. A little beaker of fuel- perhaps 200ml—and the diesel specialist says with a shrug of his shoulders– and I quote—'That is your diesel. We have tested it for water and it came back negative'. 'Well that's a relief' I say to the diesel specialist. I will have to remember to tell my local fueling spot that their diesel is good . . . . Friday September 24— The dealer calls. 11:57am. '***They are not covering anything under warranty***' he says. I am stunned. 'What do you mean', I ask, getting agitated. '***They say you have water in your fuel and that it has caused rust which has destroyed your fuel system. The entire fuel system needs to be replaced and they will not cover any of it***.' 'Bull*%$@' I say. 'You tested the fuel and didn't find water' . . . . 'Doesn't matter" he says. 'That's what they say. Maybe you can go through insurance or something . . . . ***You're going to have to pay for the truck to[o],' he adds. 'You know. The rental. They have rejected everything***.' 'You have got to be kidding me'. I am still in shock. I start to think and ask. 'Please explain to me how water in the fuel, causes rust in the tank, that destroys the entire fuel system

to the point where everything needs to be replaced, *on a 6 month old truck with 10,000km on it*. Particularly, when there is a water separator on the truck - which should separate the water- a 4 micron filter that is white, not rusty colored, AND there are water sensors on the truck that are supposed to detect and warn of water in the fuel - exactly this.' 'I can't' was all he could offer. 'I need to get the truck off my hoist. What do you want to do'. 'Nothing'. I responded. 'I am not paying one red cent for anything! This is unconscionable!!' I called my case manager at FCA about 15 times yesterday. Left her a voicemail every time. She did call back . . . [and] left me a voicemail [saying] that [they] were 'waiting for feedback from the dealer.' As if!! So here I sit. Saturday September 24, My wife's birthday (happy Bday baby). Confused, a little mad, kind of sad, but overall I am just completely disappointed with the human race. These are the kinds of things I watch on marketplace, shake my head and tsk at the injustice of it all . . . ."[40]

88.    On September 20, 2016, a 2015 Dodge Ram EcoDiesel® owner posted the following CP4-facilitated failure:

"I have a 2015 Lonestar 4X4 with little under 20,000 miles. I just put in shop last week to do Service electronic throttle, the bright red lightening bolt, the low oil pressure and engine light coming on and oh yeah it would not restart. So they are saying the high pressure diesel pump imploded and sent metal shavings through the fuel system. They are checking now to see if that has gone into the engine. They are in talks with Chrysler on how to proceed with repairs."[41]

89.    On January 29, 2017, the owner of a 2014 Jeep Grand Cherokee reported the following failure to NHTSA:

"SERVICE DEF CAME ON AT 34,000 MILES. DEALER SAID THAT THE DEF WAS CONTAMINATED WITH CRYSTALS

---

[40] Sept. 24, 2016, posting on CarComplaints.com forum re: "2016 Ram 1500 Owner Comments," available                                                                        at https://www.carcomplaints.com/Ram/1500/2016/fuel_system/entire_fuel_system_failure.shtml (last accessed Nov. 28, 2018) (emphasis added).

[41] Sept. 20, 2016, Ecodieselram.com forum thread entitled, "High Pressure Diesel Pump," available at https://www.ecodieselram.com/forum/threads/high-pressure-diesel-pump.1004/ (last accessed Nov. 19, 2018).

AND THE PUMP NEEDED REPLACED. REFUSED TO COVER IT UNDER WARRANTY DUE TO CONTAMINATION. ONLY PEAK BLUE DEF WHICH MEETS ISO 22241 HAS BEEN USED IN THE VEHICLE. DEALERSHIP THEN TOLD US TO DRIVE THE VEHICLE UNTIL THE BACK ORDERED PART WAS AVAILABLE. WHEN QUERIED ABOUT THE VEHICLE GOING INTO "LIMP MODE" THEY AGREED IT WAS A POSSIBILITY. THEY WOULD NOT PROVIDE A LOANER VEHICLE UNTIL THE PART ARRIVED AND WILL NOT COVER UNDER WARRANTY. THERE ARE HUNDREDS OF CASES ON JEEP FORUMS WITH THE SAME ISSUE. IT IS A SAFETY ISSUE IF A DEALER TELLS YOU TO DRIVE A VEHICLE THEY KNOW WILL GO INTO LIMP MODE, ESPECIALLLY ON A FREEWAY. WE ALSO HAVE A 14[-]MONTH[-]OLD CHILD AND LIVE IN COLORADO, BREAKING DOWN ON THE SIDE OF THE ROAD IS NOT AN OPTION. THE DEALER DOES NOT RETURN PHONE CALLS AND CHRYSLER CUSTOMER CARE SIDED WITH THE DEALER AND PROVIDED NO ASSISTANCE."[42]

90.    On February 11, 2017, the owner of a 2014 Jeep Grand Cherokee 3.0L EcoDiesel® posted the following under the thread title, "Injector pump failure.....common?" on the Jeep enthusiasts' forum JeepGarage.org:

"Yesterday, after my wife picked up the kids from daycare the Jeep decided to stall at a traffic light in a very busy intersection. No light or warnings, just died. She tried to restart to no avail. Got it towed to dealer.

"Dealer called today and found **the injector pump grenaded and sent metal shavings throughout the fuel system**."[43]

91.    This 2014 EcoDiesel® owner further noted that the dealership had informed him that the fuel injection pump was on backorder and there was no timeframe for its availability,[44]

---

[42] NHTSA ID No. 10948341.

[43] Feb. 11, 2017, JeepGarage.org forum post re: "Injector pump failure.....common?," available at https://jeepgarage.org/f222/injector-pump-failure-common-124178.html (last accessed Nov. 28, 2018) (emphasis added).

an issue that other consumers have experienced as well. (*See, e.g.*, Apr. 21, 2015 forum post on

DieselRamForum.com,    available    at    https://www.dieselramforum.com/forum/ram-1500-

ecodiesel-general-discussion/8841-think-twice-before-buying-ecodiesel.html (last visited Nov.

28, 2018) (EcoDiesel® owner posting a thread entitled, "Think twice before buying

ECODIESEL!!!" and explaining that, after trading-in his 2013 Ram 1500 Hemi for a new Ram

EcoDiesel® because he "wanted better gas mileage," he found himself broken down on the side

of the road multiple times due to sudden engine stalling caused by fuel pump failure, then found

out from his Dodge Ram dealer that the replacement pump was on backorder for two weeks).

92.    Similarly, on July 6, 2017, the owner of a 2014 Dodge RAM 1500 reported the

following failure to NHTSA:

> CHECK ENGINE LIGHT ON WITH FUEL SYSTEM ERROR
> WARNING. HAD TO REPLACE FULE PUMP ASSEMBLY."[45]

93.    On November 30, 2017, the driver of a 2016 Dodge Ram 1500 reported the

following incident to NHTSA:

> "TRUCK SHUTDOWN WHILE DRIVING DOWN HIGHWAY @ 65 MPH
> WITHOUT ANY OTHER SYMPTOMS. HAD TO COAST TO SIDE OF
> BUSY ROAD. SERVICE ELECTRONIC THROTTLE CONTROL FLASHED
> AS WELL AS THE CHECK ENGINE LIGHT. THE TRUCK NEVER
> STUTTERED OR LOST ANY POWER PRIOR TO THIS. DEALERSHIP
> STATES THAT IT IS BAD DIESEL FUEL. REPLACED HPFP BUT TRUCK
> WILL STILL NOT START. CHRYSLER HAS INSTRUCTED DEALER TO
> REPLACE ENTIRE FUEL SYSTEM. THIS HAS NOT BEEN DONE YET
> BECAUSE CHRYSLER WILL NOT WARRANTY EVEN THOUGH THE
> TRUCK IS STILL UNDER WARRANTY."[46]

---

[44] *See* Feb. 14, 2017, JeepGarage.org forum post re: "Injector pump failure.....common?," available at https://jeepgarage.org/f222/injector-pump-failure-common-124178.html (last accessed Nov. 28, 2018) (emphasis added).
[45] NHTSA ID No. 11003301.
[46] NHTSA ID No. 11051571.

94.    On December 6, 2017, the following customer complaint involving a 2016 Dodge Ram 1500 EcoDiesel® was posted on www.Ram1500Diesel.com under the thread titled, "HPFP Failure:"[47]

> "My 2016 Ecodiesel (31000 miles) quit while travelling down highway and had to coast to shoulder. Motor didn't shudder, loose power or any other symptom...CEL flashed and motor just down at 70 MPH. Dealer diagnosis is contaminated fuel caused the HPFP to 'clog'. They replaced HPFP and truck will still not start. That was 2 1/2 weeks ago and it's still at dealer. Chrysler recommends replacing entire fuel system but will not warranty because dealer states reason is contaminated fuel. They don't know what it's contaminated with only that the sample from the tank looks cloudy. Insurance inspector looked at it yesterday and discovered metal shavings in the old HPFP (insurance claim still pending). Dealer acknowledged today the metal shavings in the pump but said it could have been caused by contaminated fuel...[And] thus it is still not covered under warranty."

95.    One CP4-failure-seasoned member aptly responded the next day, "Contaminated fuel was VW's first excuse for failing HPFP's [High Pressure Fuel Pumps]. So bogus."[48]

96.    As another frustrated 2015 Dodge Ram 1500 EcoDiesel® owner noted in the same Ram1500Diesel.com forum, "Time for FCA to step up, and have a long-term solution to this debacle of an engine. I'm regretting my hasty purchase more and more. I don't mean to sound all negative, but this is my hard-earned daily driver, and I can't afford to trade it, just because I'm afraid of impending failure. Design or procure a reliable drop-in replacement . . . ."[49]

---

[47]    Dec. 6, 2017, Ram1500Diesel.com thread entitled, "HPFP Failure," available at https://www.ram1500diesel.com/forum/ram-1500-diesel-general-discussion/48217-hpfp-failure.html (last accessed Jan. 11, 2019).
[48]    Id.
[49]    Apr. 8, 2015, Ram1500Diesel.com thread entitled, "Edmund's Test Update, Uh Oh," available at https://www.ram1500diesel.com/forum/ram-1500-diesel-general-discussion/5492-edmunds-test-update-uh-oh.html (last accessed Nov. 21, 2018).

97.     In fact, the failure is so frequent that consumers have complained about replacement parts constantly being on backorder.[50] For example, on July 22, 2015, a Dodge Ram EcoDiesel® owner posted, "Dealer called. Fuel pump has to be replaced. None in stock, so getting rental car."[51]

98.     Even the famous vehicle-vetting guru, Dan Edmunds, experienced an engine failure in the EcoDiesel®-powered Dodge Ram 1500 that sounds eerily familiar. The following March 2015 article from Mr. Edmunds speaks volumes about the magnitude of the defect (as well as FCA's ostensible chokehold on the automotive industry):

> Our 2014 Ram 1500 Ecodiesel is back in our hands after an extended stay at McPeek's Dodge of Anaheim, the dealership that was closest to the point at which it stalled abruptly. And by "extended stay" I mean 12 days.
>
> Why so long? The Ram engineering group in Detroit got involved. But not because I asked them to — I didn't. Maybe someone who knew someone saw the Tweet I'd sent out while I was waiting for the tow truck. Perhaps the problem description raised a red flag.
>
> As well it should. A stall while moving is a rare yet serious failure mode. I'm told they wanted to fully understand the circumstances in order to determine the root cause . . . . Twelve days without a truck does not feel like the red carpet treatment, even if the dealer did offer a loaner . . . . The work ticket also lists the original trouble codes as P0087 and P016F, which have to do with low fuel rail pressure. (Two fuel rails sit under[ ]hood and feed three fuel injectors each). The mechanic and the district service rep didn't suffer a stall during their test drives, but they did experience the long crank and observed sluggish response under heavy acceleration, a symptom I hadn't experienced because I hadn't been hauling cargo or hauling butt in the days leading up to the stall. But

---

[50] *See supra* ¶¶ 91-92 (discussing Feb. 11-14, 2017, JeepGarage.org forum posts re: "Injector pump failure.....common?," available at https://jeepgarage.org/f222/injector-pump-failure-common-124178.html (last accessed Nov. 28, 2018).)

[51] Jan. 22, 2015, Ram1500diesel.com thread entitled, "Blown Fuel Pump Fuse," available at https://www.ram1500diesel.com/forum/ram-1500-diesel-electrical/6942-blown-fuel-pump-fuse.html#post91381 (last accessed Nov. 21, 2018).

they found more than trouble codes. The measured fuel flow rate was low. ***And an inspection magnet latched on to a tiny piece of metallic debris in the high-pressure side of the fuel system***. I don't think they expected that.

[. . .]

They ruled out the possibility of contaminants in the tank or the fuel after they drained and inspected the tank.

At this point the specific reason for the low rail pressure and source (and extent) of the debris in the high-pressure part of the fuel system remained unknown.

[. . .]

So they decided to remove and inspect the entire fuel system from the in-tank canister and its submerged feeder pump to the injector pump to the fuel rails and the injectors themselves.

99.    However, the Edmunds article ends with suspiciously exculpatory treatment of FCA, *in toto* (the accompanying veracity of which is hard to believe):

Now that it's back, everything appears normal and the truck runs great. It makes good power and torque, and the fuel economy seems to be right where it should be. ***It's worth noting that the 3.0-liter V6 turbodiesel engine itself was never implicated. Its injector rails and fuel injectors were replaced only because of their proximity to where the debris was found, but neither is considered to be the source***.[52]

100.    In fact, on April 16, 2018, the "Fiat Chrysler 3.0-L V6 EcoDiesel" engine was featured as one of the *Seven Engines to Avoid like The Plague*.[53] The review further noted that

---

[52] Dan Edmunds, Director of Edmunds Vehicle Testing, *2014 Ram 1500 EcoDiesel Long-Term Road Test*, EDMUNDS.COM, Mar. 3, 2015, available at https://www.edmunds.com/ram/1500/2014/long-term-road-test/2014-ram-1500-ecodiesel-back-in-service.html (last accessed on November 29, 2018) (emphasis added).

[53] Apr. 16, 2018, "Seven Engines to Avoid Like The Plague," MSN.COM, available at https://www.msn.com/en-ca/autos/research/seven-engines-to-avoid-like-the-plague/ar-AAvS762?li=AAggNb9#page=7 (last accessed Apr. 15, 2019).

"[t]he 3.0-L turbodiesel V6 'EcoDiesel' supplied by former Fiat affiliate VM Motori and made available optionally on the Ram 1500 light-duty truck and Jeep Grand Cherokee can fail relatively early in its service life. So much so that the Ram 1500 equipped with the EcoDiesel engine has been branded a lemon by the Automobile Protection Association and *Lemon-Aid* [by] author Phil Edmonston.[54]

### F.  Supposed "Remedies" are Insufficient and Costly.

101.    Because of its incompatibility with U.S. diesel fuel, CP4 pumps and corresponding fuel injection systems, even when replaced or "fixed," will continue to fail in the Class Vehicles. Indeed, in a June 2010 email chain between Bosch and representatives of Audi and Volkswagen regarding the failure of a CP4 pump in a 2010 Audi A3 TDI, Audi asked Bosch, *"[W]hy are the defects mentioned below still present after replacing the high-pressure pump and the injector? What could the [dealer] have done wrong by way of incorrect repair so that such defects are appearing?"* Bosch responded that "[i]n this case the complete fuel system (HPFP, rail, injectors, **all** lines) need to be changed . . . . I assume that because of the 'cruncher,' the entire system is contaminated with chips, which are then pumped in circulation and can soon lead to the next failure! The rough running can be explained by the fact that a chip is already present before or in the injector and is impairing its function."[55]

102.    There is no true "fix" for these vehicles; assuming U.S. diesel fuel standards remain in effect, the failures will continue, as evidenced by the following incident posted on JeepGarage.Org in May 2014:

---

[54] *Id.*

[55] March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 79-80 (Jun. 7-9, 2010 email chain between

Now . . . onto my Ecodiesel. On April 26th, it experienced a major meltdown accompanied by the flashing dash lights of death. All sorts of codes showed up on the EVIC screen... low oil pressure, service electronic throttle control, service 4 wheel drive system were the major ones along with a number of OBDII codes which I pulled with my code reader. I had it towed to a dealer and it has been there ever since.

The original diagnosis was that the diesel injector pump failed and I was told it would be 30+ days before I saw it and the associated fuel metering valve assembly . . . .

Parts actually showed up late last week, were installed over Thursday and Friday and the vehicle was restarted Friday afternoon. It ran for all of 30 seconds before shutting itself off. FWIW... the new injection pump assembly is listed at $3800.00.

I am now told that the pump is only putting out 800psi or so and that there is a unacceptably high rate of fuel return going back to the tank. They are now convinced that the failed pump introduced metal contamination into the injector system and have ordered new injectors, filters and fuel rails. Those parts are supposed to be in later this week.

Yesterday I formally escalated this to a request for a new replacement vehicle as this is completely unacceptable. . . . IMO, they are throwing parts at it now in the hope that they can make it run so even if they are right about metal contamination and do get it to run, who wants to deal with that for the remainder of a vehicle's lifespan?

Chrysler Engineering is now investigating whether or not they have a supplier issue with the injector pump assembly . . . .[56]

103.    The Bosch CP4 Pump problem is so prevalent that several aftermarket part manufacturers now provide kits for Chrysler, Ford, and GM vehicles equipped with the CP4 to mitigate the inevitable harm of a CP4 disaster. "Disaster Preventer Kits" or "bypass kits" usually refer to a fuel bypass system that does not prevent the failure, the loss of the expensive injection

---

Bosch, Audi, and Volkswagen representatives regarding CP4 fuel pump failure falsely attributed to "misfuel").

[56] May 14, 2014, JeepGarage.Org forum thread entitled, "Major EcoDiesel Injector Pump Issue," available at https://jeepgarage.org/f222/major-ecodiesel-injector-pump-issue-75087.html (last accessed Nov. 21, 2018).

pump, or the need to clean metal shavings from the fuel system. But these kits are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so that it will be filtered before it returns to the engine. The bypass kit directs the fuel contaminated with metal shavings into the gas tank, which is less expensive to clean than the engine and high-pressure fuel system—in other words, a "Band-Aid" solution. These bypass kits are also less expensive than more complete remedies, requiring only $300–$400 in parts, and are marketed as having the ability to "[k]eep[] injectors/rails safe from CP4 pump failure debris."[57] Many consumers have turned to this sort of remedy preemptively due to the known impending failures their vehicles are facing.

104.    Another method of addressing the Bosch CP4 Pump failure is to modify the Class Vehicles to return to the older, more reliable technology of simply using more fuel. With Duramax engines, the strategy may be simply to buy a predecessor CP3 pump from an independent automotive parts vendor and install it in place the Bosch CP4 Pump. Indeed, the CP4 pump is so substandard that many Class Vehicle owners have opted to replace their CP4 pumps with CP3 pumps at a cost of at least $3,000 per vehicle for the replacement parts alone.[58] Resorting to this "remedy," however, fails to make consumers whole; they are simply not getting the fuel efficiency and/or performance promised with the Bosch CP4 Pump, and for which they paid a premium. Further, consumers are having to pay thousands of dollars out of pocket to essentially redesign a design flaw that was intentionally implemented by FCA in the Class Vehicles.

---

[57] Online sales listing for "CP4.2 bypass kit (2011+)," S&S DIESEL MOTORSPORT, available at https://ssdiesel.com/shop/all/ford-6-7-cp4-2-bypass-kit-2011/ (last accessed Nov. 13, 2018).
[58] *See*, *e.g.*, http://www.engineered-diesel.com/lml-duramax-cp3-conversion-kit-with-re-calibrated-pump-50-state-carb-certified (selling "CP3 Conversion Kit with re-calibrated Pump[s]" for $3,000.00 and noting that the "[k]it is designed to replace the less reliable CP4 that comes stock on the LML").

105.    Another potential "remedy" is to leave the CP4 in place on the Class Vehicle, but install a lift pump, an additional pump to assist the Bosch CP4 Pump and increase the fuel pressure.  But, again, this "remedy" deprives consumers of the fuel-efficiency for which they paid a premium.

106.    The added lift pump and CP3 pump options *partially* (and inadequately) attempt to remedy the problem by pumping and burning more fuel. Thus, in addition to the expense of buying a new, potentially warranty-voiding fuel injection pump, owners are further required to purchase much more fuel than originally advertised or anticipated in order to emulate the "ordinary use" of Class Vehicles as originally promised, expressly and impliedly.

107.    A fourth way to mitigate the damage is to spend money for fuel additives to increase the lubricity of the fuel. This approach may work best in conjunction with the previously discussed modifications, but even by itself, it can be expensive, and its effectiveness is unproven.

108.    In short, there is no known way to remedy or mitigate CP4 pump failure without decreasing the fuel efficiency promised to Plaintiffs and other Class members and without significant expense to Plaintiffs and other Class members.

### G. In Falsely Trumpeting the Quality, Performance, and Dependability of its EcoDiesel® Engine Vehicles to Consumers, FCA Concealed—Both Affirmatively and Via Omission—the Defective Nature of the CP4 Fuel Pump.

109.    At least from 2013 through 2018, FCA has extensively advertised the performance benefits of the EcoDiesel® engine located within all of the subject the Class Vehicles, and specifically and falsely demonstrated in all of its American advertisements that the Class Vehicles are compatible with U.S. diesel fuel because said advertisements show the Class Vehicles *driving in America*. At all times relevant to this action, FCA omitted and/or concealed

the CP4 fuel pump defect. Indeed, at no point during the time period relevant to this action did FCA inform buyers and/or lessees of the Class Vehicles that the Bosch-supplied CP4 fuel pump and accompanying fuel system components within the EcoDiesel® engine were incompatible with the ordinary use of American diesel fuel, or that the defective CP4 pump starts damaging the vehicle's fuel injection system and engine immediately upon the vehicle's first use. In fact, FCA advertisements represents that the Class Vehicles are fit for driving on *America roadways* which implies that American diesel fuel is being used in, and compatible with, the Class Vehicles, this is simply not true from day one.

110.    Likewise, FCA repeatedly told consumers that the Class Vehicles were dependable, long-lasting, and of the highest quality. In so doing, FCA led consumers to believe that the Class Vehicles would be free from defects that result in fuel injection system failure and consequential engine shutdown which results in outrageously expensive repair costs.

111.    In its brochures and advertisements for the Class Vehicles, FCA consistently touted the performance benefits of the EcoDiesel® engine.

112.    For example, FCA's advertisement brochure for the 2014 Grand Jeep Cherokee touts the new 3.0L EcoDiesel® engine, claiming it "treats your fuel budget with respect," with "EFFICIENCY—30 MPG." FCA's promotion of the new diesel Jeep Cherokee was as being as tough as its predecessors, while adding "refinement." The efficiency of FCA's EcoDiesel®-equipped Ram trucks was promoted with the phrase, "SAY HELLO TO LOWER COST OF OWNERSHIP."[59]

---

[59] 2016 Jeep Grand Cherokee EcoDiesel® Brochure (advertisement).

113.    FCA further claimed that its 2014 Dodge Ram EcoDiesel® vehicles were durable in spite of varying fuel quality, touting that "the available 3.0L EcoDiesel V6 utilizes dual-filtration technology for greater . . . durability."

114.    The 2015–16 brochures for the Jeep Grand Cherokee also features the EcoDiesel® badge, which touts best-in-class fuel economy, range, horsepower, and torque.

115.    In its EcoDiesel® advertising, FCA specifically targets consumers "who want to drive an efficient, environmentally friendly truck without sacrificing capability or performance."[60] Indeed, it claims that the Ram 1500 EcoDiesel® was "the NAFTA market's first and only light-duty pickup powered by clean diesel technology."[61]

116.    FCA also claims that the EcoDiesel® engines equip the Ram 1500 with the "best fuel economy of any full-size pick-up"[62] and the Jeep Grand Cherokee "with an incredible 730-mile highway driving range, you can find hundreds of miles of discovered roads and be confident you'll find your way back."[63]

117.    Another theme of FCA's misleading advertising campaign is the Class Vehicles' power, including torque and towing capacity. FCA claims that the 2015 Jeep Grand Cherokee equipped with a 3.0-liter EcoDiese®l V6 engine has best-in-class towing capability of up to

---

[60] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone (Ram trucks blog operated by FCA US LLC) (July 16, 2013), https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/.

[61] Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014, Chrysler Group LLC (FCA) (Dec. 12, 2013), http://www.fcanorthamerica.com/ News/ChryslerDocuments/C hryslerGroupLLC_Sustain2013Dec12.pdf.

[62] EcoDiesel—Ram 1500 HFE, Ram Trucks (FCA), available at https://www.ram trucks.co m/ en/ecodiesel/ (last accessed November 19, 2018).

[63] *Id*.

7,400 pounds.[64] Similarly, FCA claims that the EcoDiesel® engine has best-in-class torque: "The EcoDiesel engine delivers best-in-class 420 lb-ft of torque. Paired with an impressive 240 horsepower, this engine has serious muscle."[65]

118. FCA's website claims that "[t]he 3.0-liter V-6 EcoDiesel engine available on the Jeep Grand Cherokee and Ram 1500 pickup has been listed among Ward's '10 Best Engines' for three consecutive years. On the Ram 1500, the engine delivers the highest fuel economy among all full-size truck competitors—12% higher than the next-closest competitor. As for the Jeep Grand Cherokee, it offers fuel economy of 30 miles per gallon highway with a driving range of more than 730 miles."[66]

119. FCA also touts the power and performance of the EcoDiesel® engine on its website, noting that "[t]he EcoDiesel engine delivers best-in-class 420 lb-ft of torque. Paired with an impressive 240 horsepower, this engine has serious muscle."[67]

120. Other online advertisements proclaim that the Dodge Ram 1500 EcoDiesel® is "expected to deliver an outstanding combination of best-in-class fuel efficiency, best-in-class torque and impressive capability. This new EcoDiesel is among today's most advanced diesel engines. Has emissions that are 60% lower than those produced by diesel powertrains 25 years

---

[64] *See EcoDiesel*, Jeep (FCA), available at http://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/ (last accessed November 19, 2018).

[65] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone (Ram trucks blog operated by FCA US LLC) (July 16, 2013),
https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/.

[66] *Fuel Efficiency*, FCA US LLC, http://www.fcanorthamerica.com/Innovation/Pages/Fuel-Efficiency2.aspx (last accessed Nov. 30, 2018).

[67] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone (Ram trucks blog operated by FCA US LLC) (July 16, 2013), available at https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you.

ago. The impressive combination of torque and fuel economy marks a new level of performance."[68]

121.    FCA has touted the Dodge Ram Truck brand as "the most innovative lineup of full-size trucks on the market" and boasts of the vehicles' "durable engines and features that further enhance their capabilities."[69] Ironically, FCA notes in this same advertisement that, "Truck customers, from half-ton to commercial, have a demanding range of needs and require their vehicles to provide high levels of capability. Ram trucks are designed to deliver the total package."[70]

122.    FCA's advertising for the 2015 Dodge Ram 1500 EcoDiesel® includes the representation that the vehicle has "the best fuel economy of ANY full-size pickup," and that it "offer[s] advantages that separate you from the rest of the pack: exceptional torque and superior fuel-efficient performance, *welcome biodiesel (B20) capability* . . . and a zero-hassle DEF System."[71]

123.    For the 2016 Dodge Ram 1500 EcoDiesel®, FCA similarly advertised that the "3.0L EcoDiesel V6 delivers biodiesel (B20) capability; a zero-hassle DEF System; clean dual-filtration technology; minimal $CO_2$ levels; and . . . . [t]he crowning touch? Its best-in-class 29 mpg highway fuel economy."[72]

---

[68] https://www.yarkchryslerjeepdodgeram.com/2014-ram-1500-ecodiesel.htm (last accessed Jan. 11, 2019).
[69] *Id.*
[70] *Id.*
[71]    2015    Dodge    Ram    1500    Vehicle    Brochure,    at    6,    available    at http://autotrends.org/brochures/2015-ram-1500-brochure.pdf  (last  accessed  Jan.  11,  2019) (emphasis added).
[72]    2016    Dodge    Ram    Vehicle    Brochure,    at    7,    available    at https://cdn.dealereprocess.net/cdn/brochures/ram/2016-1500.pdf (last accessed Jan. 11, 2019).

124.    FCA has represented in its television, internet, and printed advertisements that the Class Vehicles are fit for driving on American roadways, by featuring the Class Vehicles driving on American roadways. In these advertisements, numerous Class Vehicles are seen traveling all sorts of American terrain as if they are all adequately drivable and compatible with American diesel fuel, **but they are not.**

125.    For example, the 2014 Dodge Ram 1500 is shown in this American television advertisement effectively towing off-terrain vehicles:[73]



126.    Likewise, this 2014 television advertisement from FCA features the "all-new" Dodge Ram 1500 EcoDiesel® driving through "Western" American terrain:[74]

---

[73]    2014 Dodge Ram Labor Day Sales Event Television Commercial, available at https://www.ispot.tv/ad/7ruK/ram-labor-day-sales-event-song-by-x-ambassadors-jamie-n-commons





 (last accessed Apr. 20, 2019).

[74]    Ram    1500    Truck    TV    Commercial,    "Rams    Trucks    West,"    available    at
https://www.ispot.tv/ad/7Goc/ram-1500-truck-ram-trucks-west



127.    In the same vein, this 2015 Jeep Grand Cherokee commercial, shown in America, features a demonstrative Class Vehicle seamlessly navigating through snowy terrain:[75]



 (last accessed Apr. 20, 2019).

[75]    2015 Jeep Grand Cherokee Official Commercial, available at https://www.youtube.com/watch?v=XfD-cBcX8-4



128.    This advertisement for the Dodge Ram 1500 EcoDiesel® likewise shows a demonstrative Class Vehicle driving on urban American roadways, and touts the vehicle's 28 miles-per-gallon gas mileage – mileage which will substantially drop once catastrophic CP4 fuel pump failure occurs:[76]

---

 (last accessed Apr. 20, 2019).
[76]    Dodge    Ram    1500    EcoDiesel®    Television    Commercial,    available    at https://www.ispot.tv/ad/7GI1/2014-ram-1500-race
 (last accessed Apr. 20, 2019).







129.    The Class Vehicle brochures and related marketing materials, seen and/or heard by Plaintiffs prior to purchase, are tied together by common themes and sometimes identical language. The specific language outlined above in FCA's marketing and advertising are false, misleading, and deceptive, as are the demonstrations of the Class Vehicles driving in America which falsely represents that the vehicles are compatible with American diesel fuel.

### H. FCA Designed, Manufactured, Distributed and Sold Vehicles It Knew Would Experience Catastrophic Failures Which FCA Would Not Honor Under Its Warranties.

130.    In addition to the aforementioned representations, FCA also provided an express 5-year/100,000-mile written warranty on the Class Vehicles it manufactured.[77] This Powertrain Limited Warranty specifically covers "Parts Covered – Diesel Engine…..fuel injection pump and injectors."

---

[77]    *See* 2014 Dodge Ram Trucks Brochure, at 4, available at https://www.ramtrucks.com/assets/pdf/brochures/2014_ram_pickups.pdf (last accessed Jan. 10, 2019).

131.    On many occasions, however, FCA has refused to honor its warranties—even after its EcoDiesel® customers presented the same fuel pump system issue in the Class Vehicles two (or more) times for repair under warranty. In return, FCA has deviously claimed that the metal shavings and Class Vehicle failures are not caused by FCA and thus not covered under warranty.

132.    Despite the clear mis-match between the CP4 fuel pump and American diesel fuel, FCA has cleverly passed the average $8,000.00–$20,000.00 cost of catastrophic failure along to the consumer. The logic is that when the extremely simple CP4 self-destructs due to its sharp interface of surface to surface friction under high pressure and its usage of very little fuel incompletely maintaining lubrication, its innate incompatibility with American diesel produces metal shavings in the fuel, which is then launched into the high-pressure fuel system and the engine. Warranties do not cover the use of contaminated fuel. Because the fuel is now contaminated with metal from the pump, the repairs are for fuel contamination and are not covered by the warranties.

133.    FCA induced Plaintiffs and other Class members to pay a premium for increased durability, performance and fuel efficiency, with a design it has long known would cause fuel contamination—a condition FCA now uses to absolve itself of the catastrophic and costly consequences to Plaintiffs and other Class members.

   **I.    Allegations Establishing Agency Relationship Between Manufacturer FCA and FCA-Authorized Dealers.**

134.    Upon information and belief, Manufacturer Defendant FCA has impliedly or expressly acknowledged that FCA-authorized dealerships are its sales agents, the dealers have

accepted that undertaking, FCA has the ability to control authorized FCA dealers, and FCA acts as the principal in that relationship, as is shown by the following:

    i.    Manufacturer FCA can terminate the relationship with its dealers at will;

    ii.    The relationships are indefinite;

    iii.    Manufacturer FCA is in the business of selling vehicles as are its dealers;

    iv.    Manufacturer FCA provides tools and resources for FCA dealers to sell vehicles;

    v.    Manufacturer FCA supervises its dealers regularly;

    vi.    Without Manufacturer FCA, the relevant FCA dealers would not exist;

    vii.    Manufacturer Principal FCA requires the following of its dealers:

        1.    Reporting of sales;

        2.    Computer network connection with Manufacturer FCA;

        3.    Training of dealers' sales and technical personnel;

        4.    Use of Manufacturer FCA-supplied computer software;

        5.    Participation in Manufacturer FCA's training programs;

        6.    Establishment and maintenance of service departments in FCA dealerships;

        7.    Certify FCA pre-owned vehicles;

        8.    Reporting to Manufacturer FCA with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9. Displaying FCA-brand logos, such as Dodge and Jeep, on signs, literature, products, and brochures within FCA dealerships.

viii. Dealerships bind Manufacturer FCA with respect to:

1. Warranty repairs on the vehicles the dealers sell; and

2. Issuing service contracts administered by Manufacturer FCA.

ix. Manufacturer FCA further exercises control over its dealers with respect to:

1. Financial incentives given to FCA dealer employees;

2. Locations of dealers;

3. Testing and certification of dealership personnel to ensure compliance with Manufacturer FCA's policies and procedures; and

4. Customer satisfaction surveys, pursuant to which Manufacturer FCA allocates the number of FCA cars to each dealer, thereby directly controlling dealership profits.

x. FCA-authorized dealers sell FCA-brand vehicles on Manufacturer FCA's behalf, pursuant to a "floor plan," and Manufacturer FCA does not receive payment for its cars until the dealerships sell them.

xi. Dealerships bear Manufacturer FCA's brand names, use its logos in advertising and on warranty repair orders, post FCA-brand signs for the public to see, and enjoy a franchise to sell Manufacturer FCA's products, including the Class Vehicles.

xii. Manufacturer FCA requires FCA dealers to follow the rules and policies of Manufacturer FCA in conducting all aspects of dealer business, including the

delivery of Manufacturer FCA's warranties described above, and the servicing of defective vehicles such as the Class Vehicles.

xiii.    Manufacturer FCA requires its dealers to post FCA's name, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized FCA-brand dealers and servicing outlets for Manufacturer FCA cars.

xiv.    Manufacturer FCA requires FCA dealers to perform Manufacturer FCA's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Manufacturer FCA.

xv.    Manufacturer FCA requires FCA dealers to use parts and tools either provided by Manufacturer FCA, or approved by Manufacturer FCA, and to inform FCA when dealers discover that unauthorized parts have been installed on one of Manufacturer FCA's vehicles.

xvi.    Manufacturer FCA requires dealers' service and repair employees to be trained by FCA in the methods of repair of FCA's vehicles.

xvii.    Manufacturer FCA audits FCA's dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xviii.    Manufacturer FCA requires its dealers to provide FCA with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer FCA's vehicles.

xix.    Manufacturer FCA provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xx.    Manufacturer FCA provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer FCA to consult when dealers are unable to correct a vehicle defect on their own.

xxi.    Manufacturer FCA requires FCA vehicle owners to go to authorized FCA dealers to obtain servicing under FCA warranties.

xxii.    FCA dealers are required to notify Manufacturer FCA whenever a car is sold or put into warranty service.

## V.  TOLLING OF THE STATUTE OF LIMITATIONS

135.    As of the date of this Complaint, FCA continues to market its vehicles based on superior durability, performance, and fuel efficiency, despite their knowledge that the Class Vehicles are defective and have catastrophically failed or inevitably will catastrophically fail, and that FCA will not cover such catastrophic failure under its manufacturer-based warranties. In fact, FCA still has not disclosed and continues to conceal that the Class Vehicles are defective, incompatible with American diesel fuel, and will experience catastrophic and costly failure.

136.    Until shortly before the filing of this Complaint, Plaintiffs and other Class members had no way of knowing about FCA's wrongful and deceptive conduct with respect to their defective Class Vehicles.

137.    With respect to purchasers and lessors of the Class Vehicles, Plaintiffs and other Class members did not discover and could not reasonably have discovered prior to purchase that their Class Vehicles are defective, that their Class Vehicles are out of specification and

incompatible with American diesel fuel, that this incompatibility results in the breakdown of vehicle components and contamination of fuel caused by the defective CP4 fuel pump, that the durability and performance of their Class Vehicles is impaired by this defect and incompatibility and that such durability and performance is far less than FCA promised, or that, as a result of the foregoing, they overpaid for their vehicles, the value of their vehicles is diminished, and/or their vehicles will require costly modification to avoid a catastrophic, even more costly failure, and that any such modifications will impair other qualities of the Class Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and other Class members.

138.    With respect to Class Vehicles that have experienced a catastrophic CP4 pump failure prior to the filing of this Complaint, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their CP4 pump failure was due to a defect known to FCA or that such failure was due to an incompatibility between the Class Vehicle and the fuel intended by FCA to be used in the Class Vehicles.

139.    Within the time period of any applicable statutes of limitation or repose, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that FCA was concealing the conduct complained of herein and misrepresenting the defective nature of the Class Vehicles.

140.    Plaintiffs and other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect that FCA did not report information within their knowledge to consumers, dealerships or relevant authorities; nor would a reasonable and diligent investigation have disclosed that FCA was aware of the non-conforming and defective nature of the CP4 fuel pump and the Class Vehicles in which it was incorporated.

Plaintiffs only learned of the defective nature of the CP4 fuel injection pump and their vehicles and of FCA's plot to design and sell such unfit defective vehicles shortly before this action was filed, and were diligent in trying to uncover the facts once Plaintiffs suspected that FCA US's wrongdoing caused them to sustain the damages described herein.

141.    All applicable statutes of limitation and repose have also been tolled by FCA's knowing, active, and fraudulent concealment, and denial of the facts alleged herein throughout the time period relevant to this action.

142.    Instead of disclosing the defective nature of the CP4 fuel pumps to consumers, FCA has falsely represented that CP4 pump failure in the Class Vehicles is caused by Plaintiffs' or other Class members' conduct or by the use of contaminated fuel.

143.    In reality, FCA's conduct in designing, manufacturing, marketing or selling Class Vehicles for use with American diesel fuel, with which FCA knew the Class Vehicles were incompatible, causes the "fuel contamination" that ultimately leads to a catastrophic CP4 pump failure.

144.    FCA, with the purpose and intent of inducing Plaintiffs and other Class members to refrain from filing suit, pursuing warranty remedies, or taking other action with respect to FCA's conduct or the Class Vehicles, fraudulently concealed the true cause of CP4 pump failure by blaming Plaintiffs, Class members and/or other causes when FCA, even before the design, manufacture or sale of the Class Vehicles, knew that the defective nature of the Bosch CP4 Pump would and has caused fuel contamination and resulting catastrophic CP4 pump failure.

145.    FCA was under a continuous duty to disclose to Plaintiffs and other Class members the true character, quality and nature of the durability and performance of Class Vehicles, the ongoing process of fuel contamination in Class Vehicles, CP4 pump failure, and

the true cause of CP4 pump failure. Instead, FCA knowingly, affirmatively, and actively concealed or recklessly disregarded the foregoing facts. As a result, FCA is estopped from relying on any statutes of limitation or repose as a defense in this action.

146.    For the foregoing reasons, all applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by FCA's fraudulent concealment with respect to all claims against FCA; and, FCA is estopped from asserting any such defenses in this action.

## VI. CLASS ACTION ALLEGATIONS

147.    Throughout this Complaint, "Class Vehicle" is defined as any FCA-manufactured vehicle fitted at any time with a Bosch CP4 fuel pump.

148.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following class (collectively, the "Class"):

> All persons or entities who purchased or leased the Class Vehicles (2014–18 model year FCA-manufactured diesel vehicles equipped with an EcoDiesel® 3.0-Liter V6 engines and/or CP4 high-pressure fuel injection pump systems) in the state of Texas.

149.    Excluded from the Class are FCA and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which FCA has a controlling interest. In addition, governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded from the Class. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

150.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

151.    The Class Representatives are asserting claims that are typical of claims of the Class, and they will fairly and adequately represent and protect the interests of Class in that they have no interests antagonistic to those of the putative Class members.

152.    The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual Class members to redress the wrongs done to them. Plaintiffs and other members of the Class have all suffered harm and damages as a result of FCA's unlawful and wrongful conduct. Absent a class action, FCA will likely not have to compensate victims for FCA's wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future; indeed, upon information and belief, FCA continues to deny the faulty nature of its CP4-equipped EcoDiesel® vehicles.

153.    **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The Class is so numerous that individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class Plaintiffs is at least in the thousands, and are numerous and geographically dispersed across Texas. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class members will receive by virtue of this litigation so that they may self-identify. The disposition of the claims of Class members in a single class action will provide substantial benefits to all Parties and the Court. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The number of persons for whom this action is filed who are citizens of Texas effectively exhausts the membership of the class, with

the potential exception of some few, but unknown, transients in Texas or residents of Texas who happen to be citizens of other states.

154.   **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

a.   Whether FCA engaged in the conduct alleged herein;

b.   Whether FCA knew about the CP4 fuel pump defect and the inherent problems related thereto when said component part is used with American diesel fuel, and if so, how long FCA knew or should have known as much;

c.   Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce in the United States;

d.   Whether the diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

e.   Whether FCA omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

f.   Whether FCA designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate fuel injection systems;

g.   Whether FCA's conduct violates Texas consumer protection statutes, and constitutes breach of contract or warranty and fraudulent concealment, as asserted herein;

h.   Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale or lease; and

i.   Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, what amount.

155.   **Typicality under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of the other Class members' claims because all have been comparably injured through FCA's wrongful conduct as described above.

156.   **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent. Additionally, Plaintiffs have retained counsel with substantial experience in handling complex class action and multi-district litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

157.   **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA. Accordingly, it would be impracticable for the members of the Class to individually seek redress for FCA's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII. CAUSES OF ACTION
## CLAIMS BROUGHT ON BEHALF OF THE CLASS
## AND ON BEHALF OF THE NAMED PLAINTIFFS

## COUNT I
## FRAUD BY OMISSION/MISREPRESENTATION

158.    Plaintiffs re-allege and incorporate Paragraphs 1 through 152 as though fully set forth herein.

159.    Plaintiffs bring this Count individually and on behalf of the Class against FCA.

160.    As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain, but received less than what was bargained for.

161.    As alleged above, FCA intentionally concealed and suppressed material facts concerning the durability, performance, fuel efficiency, and quality of the Class Vehicles, in order to defraud and mislead the Class about the true nature of the Class Vehicles and reap the financial benefits of that deception.

162.    As alleged above, FCA and/or its predecessor entities knew at least by 2007 what American diesel fuel specifications were and how such diesel would interact incompatibly with diesel vehicles' engine and fuel systems, including the CP4 high-pressure fuel injection system.

163.    As alleged above, FCA had knowledge by at least 2013 that its diesel fuel injection systems were incompatible with American diesel fuel specifications. Specifically the CP4 fuel pump specifications for lubricity allow a maximum of 460 wear scar, whereby the required specification for American diesel fuel is 520 wear scar. By definition, the CP4 fuel pump will not be adequately lubricated by American diesel fuel.

164.    As alleged above, prior to the design, manufacture and sale of the Class Vehicles, FCA knew that the Bosch CP4 Pumps were expected to quickly and catastrophically fail in the Class Vehicles, and that such failure would result in contamination of the fuel system components and require repair and replacement of those components, the repairs or replacements of which FCA would refuse to cover under its warranties.

165.    Despite this knowledge, FCA marketed the Class Vehicles, touting the increased durability, fuel economy and performance qualities of the Class Vehicles. Marketing and advertising materials of FCA asserted that Class Vehicles as "best fuel economy of any full-size pick-up," best-in-class fuel efficiency," and "with an incredible 730-mile highway driving range….confident you'll find your way back."

166.    The foregoing omitted facts and representations were material because they directly impacted the value of the Class Vehicles purchased or leased by Plaintiffs and other Class members, because those facts directly impacted the decision regarding whether or not Plaintiffs and other Class members would purchase a Class Vehicle, and because they induced and were intended to induce Plaintiffs and other Class members to purchase a Class Vehicle.

167.    Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail, and due to its false representations regarding the increased durability and fuel efficiency of the Class vehicles, FCA had a duty to disclose to Class members that their vehicles were incompatible with the use of U.S. diesel fuel and the consequences of that incompatibility, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other vehicles or of their namesake predecessor engines, that catastrophic failure of the Bosch CP4 Pumps will damage Class Vehicle engines and engine

systems, and that Class members would be required to bear the cost of the damage to their vehicles.

168.    As alleged above, FCA made specific disclosures and representations to Plaintiffs through the marketing and advertising materials used nationally, and specifically within this District during the timeframe prior to the Plaintiffs purchasing Class Vehicles. FCA had a duty to disclose because: (1) FCA made disclosures about the Class Vehicles; (2) FCA made earlier representations that were misleading or untrue; and (3) FCA made a partial disclosure that conveyed a false impression. As outlined above, FCA made disclosures and representations that were false and misleading, therefore FCA had a duty to disclose the whole truth about the CP4 fuel pumps installed in the Class Vehicles and their incompatibility with American diesel fuel.

169.    FCA knew that Plaintiffs and other Class members reasonably relied upon FCA's false representations and omissions. Plaintiffs and other Class members had no way of knowing that FCA representations and omissions were false and misleading, that the Class Vehicles were incompatible with the fuel FCA knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the vehicles to fail, or that FCA would refuse to repair, replace or compensate Plaintiffs and other Class members for the failure of the Bosch CP4 Pumps and the known consequences of that failure to the Class Vehicles.

170.    Plaintiffs and other Class members could not have known that the Class Vehicles, which were touted by FCA for their durability, fuel efficiency, and performance, will fail when used as intended by FCA to be used.

171.    FCA knew that Plaintiffs and other Class members could not have known that Class Vehicles will fail when used as intended by FCA.

172.    FCA falsely represented the durability of the Class Vehicles and omitted material facts regarding the lack of durability of the Class Vehicles, the incompatibility of the Class Vehicles with the fuel intended by FCA to be used in the Class Vehicles, and the consequences of that incompatibility, for the purpose of inducing Plaintiffs and other Class members to purchase Class Vehicles, and to increase FCA's revenue and profits.

173.    FCA's devious scheme to design, market and sell Class Vehicles with defective CP4 pumps, knowing that U.S. diesel fuel that was certain to be used in the Class Vehicles and the consequence of using U.S. diesel fuel in those vehicles, then concealing its fraudulent scheme from the public and consumers over numerous model years, reveals a corporate culture that emphasized sales and profits over integrity and an intent to deceive Plaintiffs, other Class members and the American public regarding the durability and performance of the Class Vehicles and their fuel delivery systems.

174.    Had Plaintiffs and other Class members known that the Class Vehicles did not have increased durability over other diesel vehicles, the Class Vehicles were incompatible with the fuel intended by Plaintiffs, the other Class members and FCA to be used in the Class Vehicles (without which the Class Vehicles would serve no purpose to Plaintiffs and other Class members), or that the Class Vehicles will fail when used as intended, Plaintiffs and other Class members would not have purchased a Class Vehicle, or would have paid substantially less for their Class Vehicles than they paid based on FCA's false representations and omissions, or, in the case of Plaintiffs and other Class members whose vehicles experienced catastrophic CP4 pump failure, would have taken affirmative steps to mitigate the impact of or prevent failure.

175.    Because of FCA's false representations and omissions, Plaintiffs and other Class members have sustained damages because they own vehicles that are diminished in value, and

did not receive the benefit-of-the-bargain, as a result of FCA's concealment of the true nature and quality of the Class Vehicles.

176.    FCA's failure to disclose the incompatibility of the Class Vehicles with U.S. diesel fuel was intended to cause and did cause Plaintiffs and other Class members to operate Class Vehicles with U.S. diesel fuel; and, as a result, Plaintiffs and other Class members have been harmed resulting in damages including but not limited to the cost of repair or replacement of the CP4 fuel pump, the cost of damage caused to the Class Vehicles by a catastrophic failure of the CP4 fuel pump, loss of use of the Class Vehicles, diminished value of the Class Vehicles, loss of earnings, benefit-of-the-bargain damages and other damages.

177.    Accordingly, FCA is liable to Plaintiffs and other Class members for damages in an amount to be proved at trial.

178.    FCA's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Class members' rights and the representations and omissions made by FCA to them were made in order to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II
## VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT ("DTPA")
## (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

179.    Plaintiffs re-allege and incorporate the preceding paragraphs as though fully set forth herein.

180.    Plaintiffs assert this Count individually and on behalf of the Class against FCA.

181.    Plaintiffs assert a claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46.

182.    Plaintiffs are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.46(4).

183.    FCA engaged in "trade or commerce" within the meaning of the DTPA.

184.    Plaintiffs have made a demand in satisfaction of the Act and sixty (60) days have elapsed since the demand was made. Plaintiffs have met all conditions precedent to bringing this cause of action against FCA.

185.    The DTPA prohibits "false, misleading, or deceptive acts or services in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a). By its acts, omissions, failures, and conduct that are described in this Complaint, FCA has violated Tex. Bus. & Com. Code § 17.46(b)(1), (2), (5), (7), (9), (12) (13), (20), and (24). FCA participated in unfair and deceptive trade practices that violated the DTPA as described herein. In the course of its business, FCA concealed and suppressed material facts concerning the CP4 fuel pump. FCA falsely represented the quality of the Class Vehicles and omitted material facts regarding the incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said incompatibility), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class members to purchase Class Vehicles, and to increase FCA's revenue and profits.

186.    The facts concealed and omitted by FCA were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiffs and other Class members known of the

incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said incompatibility), and the defective nature of the CP4 fuel pump at the time they purchased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

187.    FCA's representations violate subdivisions (b)(5) and (b)(24) of the DTPA in that they constitute representations that particular goods and services have certain qualities, uses or benefits when they did not and failing to disclose information about goods or services with the intent to induce Plaintiffs to enter into transactions that they would not have entered into had the information been disclosed.

188.    Plaintiffs relied upon these representations to their detriment.

189.    Plaintiffs and the other Class members were injured and suffered ascertainable injury in act, and/or actual damages as a proximate result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their vehicles, did not get the benefit of their bargain, and their vehicles are equipped with a defective and destructive CP4 fuel pump. These injuries are the direct and natural consequence of FCA's representations and omissions.

190.    FCA's violations present a continuing risk to Plaintiffs as well as the other Class members. Accordingly, FCA is liable to Plaintiffs and the other Class members for damages in an amount to be proven at trial.

191.    Additionally, FCA's conduct described above was committed knowingly and intentionally. FCA was actually aware, at the time of the conduct of the falsity, deception, and unfairness of the conduct about which Plaintiffs complain. As a direct result of FCA's knowing and intentional misconduct, Plaintiffs suffered mental anguish. In particular, Plaintiffs suffered anxiety, intense feelings of humiliation, panic attacks, loss of sleep. Accordingly, FCA is also

liable to Plaintiffs for mental anguish damages and additional damages of up to three times the amount of economic damages as permitted by the DTPA.

**COUNT III**
**UNJUST ENRICHMENT**

192.    Plaintiffs re-allege and incorporate the preceding paragraphs as though fully set forth herein.

193.    Plaintiffs bring this Count individually and on behalf of the Class against FCA

194.    As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

195.    As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the Bosch CP4 Pump and the Class Vehicles and the concealment thereof, FCA charged a higher price for the Class Vehicles than the Vehicles' true value and FCA, therefore, obtained monies that rightfully belong to Plaintiffs and other Class members.

196.    FCA has benefitted from manufacturing, distributing, selling, and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by FCA's concealment of the defective nature of the CP4 fuel pump and of the Class Vehicles, and false representations related thereto.

197.    FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for their vehicles that actually had lower values.

198.    FCA has received and retained unjust benefits from the Plaintiffs and other Class members, and inequity has resulted.

199.    It would be inequitable and unconscionable for FCA to retain these wrongfully obtained benefits.

200.    Because FCA concealed its fraud and deception, Plaintiffs and other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from FCA's misconduct.

201.    FCA knowingly accepted and retained the unjust benefits of its fraudulent conduct.

202.    As a result of FCA's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and other Class members, in an amount to be proven at trial. Plaintiffs and other Class members, therefore, seek an order establishing FCA as a constructive trustee of the profits unjustly obtained, plus interest.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

203.    Plaintiffs re-allege and incorporate the preceding paragraphs as though fully set forth herein.

204.    Plaintiff Kevin Berry brings this Count individually and on behalf of the Express Warranty Sub-Class[78] against FCA.

---

[78] As used herein, the term "Express Warranty Sub-Class" refers to the subset of individuals within the Class who meet the following criteria:

(a)    The Sub-Class member owns or leases a Class Vehicle that has experienced a catastrophic CP4-induced failure;

(b)    The Sub-Class member or someone on his/her behalf has presented the failed Class Vehicle to an authorized FCA dealer for repair under FCA's express factory warranty during the warranty period; and

205.    Plaintiff Kevin Berry is a "consumer" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45.

206.    Defendant FCA represented and warranted to Plaintiff Kevin Berry that Plaintiff's Class Vehicle was durable, reliable, and fit for ordinary use with American diesel fuel.

207.    Defendant FCA also expressly warranted and provided for a 5-year/100,000-mile written warranty that the Class Vehicles it manufactured would be from defects and that it would repair any manufactured vehicle defects, including defects in the workmanship and materials in the Class Vehicles for that period, including Plaintiff Kevin Berry's 2014 Jeep Grand Cherokee. Specifically, under the Powertrain Limited Warranty  "Parts Covered – Diesel Engine," it lists "fuel injection pump and injectors."

208.    Defendant FCA breached its express warranties at the point of Plaintiff Kevin Berry's purchase, as the Class Vehicle was not fit for ordinary use and did not have the durability, fuel efficiency, and performance qualities FCA had publicly marketed and warranted at the time of sale, as alleged herein.[79]

209.    Defendant FCA also breached its express warranties to Plaintiff Kevin Berry after he experienced a catastrophic failure of the CP4 fuel injection pump in his Class Vehicle within

---

(c)    The Sub-Class member has incurred economic damages in addition to those of the main Class members as a result of the catastrophic failure, including but not limited to: (i) paying for repairs out-of-pocket (or through insurance) due to FCA's denial of warranty coverage for catastrophic failure-related repairs; (ii) the cost of having the Class Vehicle towed or moved to the FCA dealership after the catastrophic failure occurred; (iii) consequential damages from having to be without the Sub-Class member's Class Vehicle during the duration of the repair, including rental vehicle costs; and (iv) all such other damages stemming from the catastrophic failure of the CP4 fuel injection pump in the Class Vehicle.

[79] *See U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2003) (holding that privity of contract is not required in order to sustain a breach of express-warranty claim for economic losses because "[t]o hold otherwise could allow unscrupulous manufacturers who make public representations about their product's performance

the 5-year/100,000-mile express written warranty period. Despite bringing the failed Class Vehicle to a certified FCA-brand (Chrysler) service center, #60399 Boerne Dodge Chrysler Jeep, for repair, FCA refused to cover the repair of the Class Vehicle under warranty and sought to charge Plaintiff Kevin Berry over $9,000 for the repair. The Boerne work order states, "[c]ustomer states vehicle shut down and would not do anything, would not start, check engine light on." Boerne Dodge Chrysler Jeep dealership was authorized to make repairs under the FCA manufacturer's warranty. The dealership notes "high pressure fuel pump internal fail" as the problem with Plaintiff's vehicle. On July 27, 2018, Boerne dealership provided an invoice quote for fuel pump replacement. The Class Vehicle remained in the service center for at least three months thereafter while this dispute was pending. Plaintiff lost use of the vehicle during this time. Plaintiff has sold the vehicle for far less than expected due to the fuel pump failure.

210.    As a result of FCA's breach of its express warranties, Plaintiff Kevin Berry has been harmed, including but not limited to damages stemming from loss of use of the Class Vehicle, diminished value of the Class Vehicle, benefit-of-the-bargain loss and the cost of repair of the Class Vehicle.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY,
### (Tex. Bus. & Com. Code §§ 2.314 and 2A.212)

211.    Plaintiffs re-allege and incorporate all preceding paragraphs as though fully set forth herein.

212.    Plaintiffs bring this Count individually and on behalf of the Class against FCA.

213.    As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel

---

to remain insulated from express-warranty liability if consumers did not purchase the product

delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain, but received less than what was bargained for.

214. FCA was at all times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(2), and "seller" of motor vehicles under § 2.103(a)(4). With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

215. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code. §§ 2.105(a) and 2A.103(a)(16).

216. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law, pursuant to Tex. Bus. & Com. Code § § 2.314 and 2A.212.

217. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are incompatible with the use of American diesel fuel (the fuel intended to be used by FCA and expected to be used by Plaintiffs and other Class members), in that use of American diesel fuel (the only fuel reasonably available to Plaintiffs and other Class members) causes a breakdown of the CP4 fuel pump (a condition that FCA knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and

directly from them").

catastrophic failure of the Bosch CP4 Pump, and self-destruction of the Class Vehicle's engine and fuel delivery system.

218.    It was reasonable to expect that Plaintiffs may use, consume or be affected by the defective Class Vehicles.

219.    The Class Vehicles contained an inherent defect that was substantially certain to result in malfunction during the useful life of the product.

220.    Plaintiffs were and are third-party beneficiaries to FCA's contracts with FCA-authorized retailers who sold the Class Vehicles to Plaintiffs.

221.    In addition, or in the alternative, Plaintiffs directly relied upon FCA's advertising, as alleged above.

222.    FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to FCA, complaints by Plaintiffs or Class members to FCA either orally or in writing, complaints to FCA dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

223.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and other Class members have been damaged in an amount to be proven at trial.

**COUNT VI**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT,**
**(15 U.S.C. § 2301, *et seq.*)**

224.    Plaintiffs re-allege and incorporate the preceding paragraphs as though fully set forth herein.

225.    Plaintiffs bring this Count individually and on behalf of the Class against FCA.

226.    **A**s set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of the bargain, but received less than what was bargained for.

227.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)–(d).

228.    The Class Vehicles manufactured and sold by FCA are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

229.    Plaintiffs and other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantors the obligations of their implied warranties.

230.    FCA was a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

231.    FCA provided Plaintiffs and other Class members with an implied warranty of merchantability in connection with the purchase or lease of the Class Vehicles, that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §

2301(7). As a part of the implied warranty of merchantability, FCA warranted that the Class Vehicles were fit for their ordinary purpose as motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

232.    FCA breached its express and implied warranties, as described in more detail above, and is therefore liable to Plaintiffs and other Class members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles were equipped with defective CP4 fuel pumps that are incompatible with American diesel fuel (which fuel is intended by FCA to be used in the Class Vehicles, expected by Plaintiffs and other Class members to be used in Class Vehicles, and is the only fuel reasonably available in order for Plaintiffs and other Class members to use the Class Vehicles for their intended and ordinary purpose); when used with the intended American diesel fuel, the CP4 pump in the Class Vehicles starts to break down, and eventually results in a catastrophic failure wherein metal has dispersed so wholly throughout the engine and fuel delivery systems that the Class Vehicles are rendered inoperable.

233.    In its capacity as a warrantor, FCA had knowledge of the inherent defect in the Class Vehicles. Any effort by FCA to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

234.    Any limitations FCA might seek to impose on their warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from FCA.

235.     Any limitations FCA might seek to impose on its warranties are substantively unconscionable. FCA knew that the Class Vehicles were defective and would continue to fail during and after any purported expiration of warranties.

236.     Despite knowing that failure was expected to occur with the intended use of American diesel fuel, FCA failed to disclose these defects to Plaintiffs and the other Class members. Therefore, any enforcement of the durational limitations on those warranties is harsh and shocks the conscience, and moreover violates public policy.

237.     Plaintiffs and each of the other Class members have had sufficient direct dealings with either FCA or its authorized dealers to establish substantial connection between FCA, on the one hand, and Plaintiffs and each of the Class members, on the other hand. Notably, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and acquired the subject Class Vehicles in connection with the relied-upon warranties (express and/or implied) as well as other representations and omissions originating from FCA. Since the dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles, the warranty agreements were designed for and intended to benefit consumers.

238.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

239.     Nonetheless, FCA was provided notice of the defective and non-conforming nature of the Class Vehicles, as described herein, within a reasonable time of Plaintiffs'

knowledge of the non-conforming and defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to FCA, complaints by Plaintiffs or Class members to FCA either orally or in writing, complaints to dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships, intermediate sellers or repair facilities, and by the allegations contained in this Complaint.

240.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.00. The amount in controversy of this action exceeds the sum of $50,000 exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against FCA as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining FCA from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.　　Injunctive relief in the form of a vehicle recall, free replacement, or buy-back program;

D.　　An order establishing FCA as a constructive trustee over profits wrongfully obtained, plus interest;

E.　　Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.　　An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

G.　　An award of costs and attorney's fees; and

H.　　Such other or further relief as may be appropriate.


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: April 23, 2019　　　　　　　Respectfully submitted,

/s/ Robert C. Hilliard
Robert C. Hilliard
Texas State Bar No. 09677700
Federal I.D. No. 5912
Hilliard, Martinez, Gonzales LLP
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com
***ATTORNEY IN CHARGE FOR
PLAINTIFFS***

**OF COUNSEL:**
Rudy Gonzales, Jr.
Texas State Bar No. 08121700
Federal I.D. No. 1896
Email: rudy@hmglawfirm.com

John B. Martinez
Texas State Bar No. 24010212
Federal I.D. No. 25316
Email: john@hmglawfirm.com
Marion Reilly
Texas State Bar No. 24079195
Federal I.D. No. 1357491
Email: marion@hmglawfirm.com
Bradford P. Klager
State Bar No. 24012969
Federal I.D. No. 24435
Email: brad@hmglawfirm.com
Lauren Akers
Texas State Bar No. 24076233
Email: lakers@hmglawfirm.com

**HILLIARD MARTINEZ GONZALES LLP**
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015

*-And-*

T. Michael Morgan, Esq.
FBN: 0062229
E-Mail: mmorgan@forthepeople.com
Secondary Email: plarue@forthepeople.com
**MORGAN & MORGAN, P.A.**
20 North Orange Ave., Ste. 1600
P.O. Box 4979
Orlando, FL 32801
Tel.: (407) 418-2081
Fax: (407) 245-3392

*-And-*

Steve W. Berman
steve@hbsslaw.com
Sean R. Matt
sean@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594